**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**William H. BARKER and Donnie L. Reed, Defendants-Appellants.**

**No. 74–1604.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 24, 1975.

Decided April 25, 1975.

---

**3.** 35 U.S.C. § 285 provides:
   The court in exceptional cases may award reasonable attorney fees to the prevailing party.

Roger J. Kiley, Jr., Vincent J. Getzendanner, Jr., Chicago, Ill., for defendantsappellants.

James R. Thompson, U. S. Atty., Gary L. Starkman and James I. Marcus, Asst. U. S. Attys., Chicago, Ill., for plaintiffappellee.

Before CASTLE, Senior Circuit Judge, and SWYGERT and STEVENS, Circuit Judges.

SWYGERT, Circuit Judge.

William H. Barker and Donnie L. Reed were convicted for violations of the Civil Rights Conspiracy Statute, 18 U.S.C. § 241, in connection with their activities during the March 21, 1972 primary election in Chicago, Illinois.[1] This statute prohibits any "conspiracy to stuff the ballot box at an election for federal officers, and thereby dilute the value of votes of qualified voters." Anderson v. United States, 417 U.S. 211, 226, 94 S.Ct. 2253, 2263, 41 L.Ed.2d 20 (1974). Defendants contend that the Government failed to prove the existence of a conspiracy specifically aimed at interfering with the election of candidates for federal offices, and that their convictions must be reversed. Defendant Reed was also convicted of knowingly submitting false information concerning his residence for the purpose of establishing his eligibility to vote, in violation of section

---

1. Section 241 provides:

    If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or

    If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured—

    They shall be fined not more than $10,000 or imprisoned not more than ten years, or both; and if death results, they shall be subject to imprisonment for any term of years or for life.

11(c) of the Voting Rights Act of 1965, 42 U.S.C. § 1973i(c). He challenges the sufficiency of the evidence supporting his conviction. Our review of the evidence in this case convinces us that the jury could have found the existence of the charged conspiracy and of a knowing submission of false information to be established beyond any reasonable doubt, and we therefore affirm both convictions.

### I

The testimony was highly conflicting. Viewing the evidence in the light most favorable to the Government, the jury could reasonably have found the following facts.

Barker and Reed were good friends and close associates. Both worked as precinct organizers for the Chicago Democratic organization in the first precinct of the twenty-second ward in the primary election on March 21, 1972, and both had taken similar roles in that precinct in previous elections. In the 1972 primary Barker and Reed worked together in an effort to deliver a high turnout for the Democratic Party. The party was particularly interested in the outcome of the races for nominations for Governor of Illinois and State's Attorney of Cook County, although candidates were also selected in this primary for United States Senator and President.

During the weeks preceding the election Barker helped to organize a canvass of the first precinct. As a part of the canvass workers went through neighborhoods in the precinct checking mailboxes and talking to the people in the area to determine whether previously registered voters had moved out of the precinct and thus become ineligible to vote in that precinct in the March 21, 1972 primary election. When it was determined that a previously registered voter had moved, a red line would be drawn through the name of that voter. Two women who were canvassing at the specific request of Barker followed the red line procedure and excised several names from the book of registered vot-

ers. After the second day of the canvass the women were met by a car containing Barker and two other election workers. The women entered the car and, after a short conversation, Barker took the book from the workers, examined it, and told the workers that they had crossed off names of persons who still lived in the precinct. He directed that certain names be reinstated, including the names "Donnie Reed" and "Donnie L. Reed." Barker knew that these two names referred to the same person, and that Reed did not live at the address indictated in the book.

On the day of the election both Reed and Barker were "in and out" of the polling place. During the morning both defendants took a number of blank ballot applications and left the polling place, returning with the applications completed. Barker and Reed each entered a number of votes on the voting machines when the applications were returned. This procedure was repeated in the afternoon with Barker and Reed entering more votes on the machines. At the end of the day the public counter on the outside of the voting machines was checked against the ballot application totals and Barker indicated in the presence of Reed and others that the numbers on the machine did not balance with the paperwork. Reed and the other election judges thereupon voted again.

In all, Reed and Barker cast forty-five illegal votes and the other election judges added ten illegal votes. The records of the Chicago Board of Election Commissioners showed that in the first precinct of the twenty-second ward, 241 Democratic and four Republican ballot applications had been filled out. In the federal contests, 205 votes were cast in the United States Senate race and 175 in the race for President.

These facts clearly support a finding that Barker and Reed conspired to cast and cause to be cast numerous false votes in the March 21 primary election. The controlling question is whether the evidence in this case is sufficient to show that the conspiracy "contemplated the

casting of false votes for all offices at issue in the election," Anderson v. United States, 417 U.S. 211, 225, 94 S.Ct. 2253, 2263, 41 L.Ed.2d 20 (1974), or at least for one of the federal offices. The jury was instructed that in order to convict the defendants the evidence would have to establish and the jury would have to conclude "beyond a reasonable doubt that it was a part of the specific plan and purpose of the conspiracy and its members, in order to promote its objectives, to interfere with the rights of voters to have their votes for federal offices counted at their full value and effect."

■ We believe that such a conclusion is fully supported by the record. The election board figures establish that 241 Democratic ballots were applied for on the day of the election and that 205 of these ballots contained votes cast in the race for United States Senate. Since Barker and Reed together cast approximately forty-five illegal votes, and since only thirty-six ballots in the first precinct did not include votes in the Senate race, some of the votes cast by Barker and Reed themselves must have been for candidates in the Senate contest. Moreover, Reed testified that the most disputed races were for State's Attorney and Governor; the jury could have inferred from this that many of the thirty-six ballots which did not contain votes in the United States Senate race were those of ordinary citizens rather than Barker and Reed. Once it was established that some of the Barker-Reed votes were cast in the Senate race it was a permissible inference that such votes were at least contemplated by both of these men when they agreed to tamper with the election results. Their convictions on the conspiracy indictment are therefore affirmed.

## II

Reed was also convicted of violating section 11(c) of the Voting Rights Act of 1965, 42 U.S.C. § 1973i(c) by filling out a false ballot application on March 21, 1972 for the purpose of voting in the primary election. Our research indicates no reported opinion construing section 1973i(c) or defining its reach. The section provides:

(c) Whoever knowingly or willfully gives false information as to his name, address, or period of residence in the voting district for the purpose of establishing his eligibility to register or vote, or conspires with another individual for the purpose of encouraging his false registration to vote or illegal voting, or pays or offers to pay or accepts payment either for registration to vote or for voting shall be fined not more than $10,000 or imprisoned not more than five years, or both: *Provided, however,* That this provision shall be applicable only to general, special, or primary elections held solely or in part for the purpose of selecting or electing any candidate for the office of President, Vice President, presidential elector, Member of the United States Senate, Member of the United States House of Representatives, Delegate from the District of Columbia, or Resident Commissioner of the Commonwealth of Puerto Rico.

The election on March 21 was held in part "for the purpose of selecting . . . [a] candidate for . . . President." This is not disputed. Reed contends instead that the proofs elicited at his trial failed to prove the offense disclosed in the indictment.

The first prong of Reed's theory is that since the indictment alleged that he had given false information "for the purpose of establishing his eligibility to register *and* to vote" (emphasis added), the Government was required to prove the knowing submission of false information both at the time of his registration and at the time he voted. The disjunctive language of the statute would make submission of false information at either time an offense. Reed relies on Stirone v. United States, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1959), and Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), in support of his contention. A review of those cases

shows that they are inapposite here. In each of those cases the indictment had charged a specific offense and specific grounds supporting the charge made. The trial judge in each case had instructed the jury in a manner which would have allowed conviction on the basis of facts and offenses never charged in the indictment.

In *Stirone*, a violation of the Hobbs Act was charged and the indictment alleged that the victim, a ready-mix supplier, used sand shipped to his plant from other states. This was the only connection with interstate commerce alleged in the indictment. Proof at trial showed, however, that a project to which the victim was shipping concrete involved the erection of a steel mill which was to manufacture articles to be distributed in interstate commerce. The jury was instructed that conviction under the Hobbs Act would be proper if either connection with interstate commerce were proved. In *Kotteakos* defendants had been charged with participation in a single conspiracy aimed at fraudulent credit transactions in violation of the National Housing Act. Proofs at trial failed to show a single conspiracy involving the defendants, but rather showed eight or more different conspiracies, all instigated by the same person. In both cases the Supreme Court held that the variance between the facts charged in the indictment and the facts upon which the defendants were (or might have been) convicted infringed the rights of the convicted defendants.

The present case is different because here the indictment clearly charged both acts upon which defendant Reed could have been convicted. Thus, the grand jury found good reason to accuse and to try Reed for each of the wrongful acts charged in the indictment and proscribed by the statute. Ex Parte Bain, 7 S.Ct. 781, 121 U.S. 11, 30 L.Ed. 849 (1887). The mere fact that the in-

dictment made its charges in the conjunctive is insufficient to require proof of each separate act where these acts are disjunctively proscribed in the statute. United States v. Jones, 491 F.2d 1382, 1384 (9th Cir. 1974); United States v. Astolas, 487 F.2d 275, 280 (2d Cir. 1973); United States v. Cioffi, 487 F.2d 492, 499 (2d Cir. 1973).

We therefore examine the evidence in this case to determine whether it is sufficient to establish that Reed knowingly or willfully submitted false information either at the time he registered or at the time he voted.

The Government rested its case primarily upon Reed's ballot application, which was completed on March 21 at a polling place in the first precinct of the twenty-second ward. A supervisor for the Chicago Board of Election Commissioners testified concerning the established procedure for applying for a ballot in a primary election. He testified that an election judge would hand the voter an application upon which the voter would write his residence address, declare his party affiliation, and sign his name. This application would then be returned to the election judge who would verify the voter's name, address, and signature by comparing the application to the voter's permanent registration card. This supervisor also testified as to the contents of Reed's ballot application. He described the application as having been signed "Donnie Reed" and as showing his address as 4384 Ogden Avenue.[2]

Other testimony showed that Reed had rented an apartment at 4063 West Fifth Avenue, an address outside the first precinct, prior to March 21, 1972 and that he was still renting this apartment on that day. The manager of the Fifth Avenue apartment testified that he had visited the apartment building several times during the period from October of 1971 to October of 1972 and that Reed was at the Fifth Avenue building on sev-

---

**2.** The transcript actually reads "2384 Ogden Avenue," but Reed has contended throughout that he resided at 4384 Ogden Avenue and

there is no question that this is merely a typographical error in the transcript.

eral of these occasions. He testified that his records indicated Reed had been renting the Fifth Avenue apartment throughout this period. The manager further stated that his resident janitor would have informed him if Reed's apartment was being left vacant since the manager did not allow tenants to rent apartments without maintaining occupancy. His janitor never made any mention of a vacant apartment.

Finally, the evidence showed that between February 1 and March 23, 1972 the building at 4384 West Ogden was vacant and no rent was paid to the landlord of that building during this interval. The rent collector testified that she had visited the building on several occasions during the month of March and that the building appeared to be empty with no sign of anyone living there. Reed testified that he had been living at this address with the permission of Barker, who had been renting the premises; but other evidence showed that Barker had ceased to occupy or pay rent on the premises in December of 1971 and therefore was in no position to give anyone permission to do anything at that address in 1972.

■ This evidence clearly supports a finding that on March 21, 1972 Reed was not living at the Ogden Avenue address and had not been living there for some time. Yet he completed a ballot application showing the Ogden address in order to qualify to vote in the first precinct. There can be little doubt that this was a "knowing" submission of false information within the language of the act: Reed certainly knew that he was not living at this address, and he knew as well that in submitting this address at the polling place he was falsely establishing his eligiblity to vote. Reed's conviction under section 1973i(c) must therefore be affirmed.

The convictions of the defendants for the crimes charged in the indictment are affirmed.