UNITED STATES of America,
Plaintiff-Appellee,

v.

Ella M. BOWMAN, Defendant-Appellant.

No. 79–5685.

United States Court of Appeals,
Fifth Circuit.
Unit A

Feb. 9, 1981.

Alcide J. Gray, Lake Charles, La. (Court-appointed), for defendant-appellant.

D. H. Perkins, Jr., John P. Lydick, Asst. U.S. Attys., Shreveport, La., for plaintiff-appellee.

Before COLEMAN, CHARLES CLARK and REAVLEY, Circuit Judges.

COLEMAN, Circuit Judge.

Appellant Ella M. Bowman was indicted and tried on four counts of paying, conspiring to pay, and aiding and abetting other people to pay, Willie Ray Henderson, John T. Buckley, Beatrice Gill, and Mae Margaret Gill to vote in the November 7, 1978, general election held in Vernon Parish, Louisiana, in violation of 42 U.S.C. § 1973i(c) (1976) and 18 U.S.C. § 2 (1976). The election was held for the purpose of electing a United States Representative from the Fourth Congressional District of Louisiana, a Vernon Parish School Board member, and a City Marshal for the City Court of Leesville, Louisiana.

As to Willie Ray Henderson, Bowman was acquitted, apparently because the jury was not convinced that Henderson had actually voted that day. He had not signed his individual voting record although he did sign the poll list. She was found guilty on all other counts and was sentenced to one-year imprisonment (suspended) and two years probation on each count with the sentences running concurrently. The sentences of imprisonment were suspended. By court-ordered special conditions of probation, Bowman was prohibited from running for public office and ordered to give the government truthful information if called upon to do so.

On appeal, Bowman argues that § 1973i(c) is unconstitutional because it is beyond the power of Congress to enact a statute which applies to *any election* in which there is a federal candidate on the ballot and when there is no proof that the payment was directed toward the federal race. In conjunction with this argument, Bowman argues that the district judge should have instructed the jury that the payment, or offer of payment, must have been made to induce the voter to vote for a Congressional candidate. She further contends that the court erred when it refused to allow her to call certain defense witnesses under Rule 17 of the Federal Rules of Criminal Procedure and when it refused to allow two defense witnesses to assert the Fifth Amendment in the presence of the jury.

Upon careful consideration, and after meticulous consideration of the factual and legal aspects of the case, we are of the opinion that the Judgment of the District Court should be affirmed.

I

*Facts*

Considering the evidence in the light most favorable to the verdict, Bowman was paid $50 by Gene Koury, the successful Democratic candidate for the school board seat, to drive voters to the polls on November 7. Koury had contacted Willie Fisher, whom he had heard organized people to drive voters, and Fisher suggested Bowman as a driver. Between 9 and 10 a. m. that morning, Bowman came to Mae Margaret Gill's apartment and asked her if she needed a ride to the polls. Gill replied in the affirmative. As Gill was getting into Bowman's van, her sister, Beatrice Gill, drove up. Bowman asked Beatrice the same question, and she too decided to come along. According to the Gill sisters, John T. Buckley was walking down the road, and Bowman offered him a ride to the polls. However, Buckley testified that he was picked up by Bowman before the Gills got into the van. Buckley testified that in reply to Bowman's offer, he asked how much he would be paid and that Bowman said five dollars. Mae Gill testified that, on the way to the polls, Bowman said they would only be paid five dollars; Beatrice Gill testified that Bowman said there wasn't much but there would be some "change" for them, "change" meaning money.

Upon arriving at the Leesville Neighborhood Community Center, the polling place, each was given a slip of paper with three numbers on it. These numbers referred to the numbers placed under each candidate's name on the voting machine. One number was "5," which referred to the Democratic candidate for Representative; one other number was "55," which designated Hubert Monk, the Democratic candidate for City Marshal. No one could remember the third number.

At trial, Mae Gill said Bowman did not say they had to vote for the numbers listed on the slip of paper in order to receive the promised payment, but she admitted that she had testified before the federal grand jury that Bowman had indicated that payment was contingent upon voting for the designated numbers. Mae Gill went on to explain that she still voted like she wanted to. In her grand jury testimony, Beatrice Gill said that when Bowman gave them the slip of paper, she did not indicate that they would be paid for voting, but at trial she said she knew they were being paid to vote. The Gill sisters and Buckley then voted and returned to the van.

Mrs. Bowman then drove to Elija Moore's white house. Beatrice Gill said Bowman wrote her name down on a piece of paper. Bowman went into the house, stayed approximately five to ten minutes, returned and gave each of them five dollars.

The same routine was followed with Willie Ray Henderson, who rode to the polls in Bowman's van, along with a Mrs. Humphrey and Eloise Peters. Immediately after getting into the van, Bowman told Henderson they would be paid five dollars for voting. Each of them was given a slip of paper with three numbers on it; Henderson could only remember the number "5." When asked what candidates were associated with the numbers, he said the election was only for school board and city marshal. After they voted, Bowman took her riders to Moore's house, went inside for approximately five minutes, and returned with five dollars for each person in the van. Henderson also testified that Bowman loaned him $60 about 20 minutes later and another $30 the following Friday to pay off a debt before he was sentenced on a marijuana conviction.

The Gill sisters and Buckley signed both the poll list and their individual voting records, while Henderson only signed his individual voting record. Both Mae Gill and Buckley told the FBI that a man named Tommy gave them the money for voting, but both admitted that this testimony was false while testifying before the grand jury and at trial. The Gills, Buckley, and Henderson all identified Bowman as the one who drove them to the community center. They picked out a photograph of it, and of the white house where they were taken after voting, from a group of photographs of buildings related to the case.

In an interview with the FBI wherein she was given the required warnings, Bowman admitted that she drove 38–40 people to the polls on November 7, 1978, and then took them to Elija Moore's house so that their names could be checked off on a list of voters. She said that she was paid by Gene Koury to drive voters, but did not know the exact amount because it was given to her in an envelope, and she gave Henderson some of it before determining exactly how much was in the envelope.

Reginald Sistrunk, an unsuccessful school board candidate in the September, 1978, primary who was a member of an informal committee which supported and campaigned for Congressman Leach in the general election, testified that, to the best of his knowledge, Bowman neither actively campaigned for nor was a part of the formal or informal structure supporting Leach. However, between 7:30 a. m. and 4 p. m. on election day, Sistrunk was at his place of employment at Fort Polk, Louisiana.

Mrs. Bowman was found to be indigent, and an attorney was appointed by the court to represent her. Bowman moved, under Federal Rule of Criminal Procedure 17,[1] to have witnesses subpoenaed without paying

---

1. Fed.R.Crim.Proc. 17(b), 18 U.S.C. (1976) provides in pertinent part:

(b) *Defendants Unable to Pay.* The court shall order at any time that a subpoena be issued for service on a named witness upon an *ex parte* application of a defendant upon a satisfactory showing that the defendant is financially unable to pay the fees of the witness and that the presence of the witness is necessary to an adequate defense. If the court orders the subpoena to be issued the costs incurred by the process and the fees of the witness so subpoenaed shall be paid in the same manner in which similar costs and fees are paid in case of a witness subpoenaed in behalf of the government.

costs. She requested the following witnesses: Ralph McRae, Jr., mayor of Leesville; Gene Koury, member of the Vernon Parish School Board; Hubert Monk, City Marshal; Robert Pines, school board member; Willie Fisher, campaign worker; Elija Moore, campaign worker; Representative Leach, winner of the House of Representatives race; Jimmie Wilson, unsuccessful candidate for Representative; and Reginald Sistrunk, unsuccessful school board candidate in the September primary. The stated purpose for calling these witnesses was that each of them, having taken an active part in the general election, either as a candidate or as campaign workers, would have direct knowledge of who employed Bowman to drive voters to the polls, who paid her, the amount she was paid, and the purpose of the payment.

The district judge referred the motion to a United States magistrate for the threshold determination of whether the testimony of the requested witnesses was relevant and necessary to an adequate defense. The hearing was held ex parte in a closed courtroom so that Bowman's defense strategy would not be revealed. At the hearing, Bowman's attorney stated his theory that the prosecution had to prove that Bowman made the payments to the voters on behalf of a Congressional candidate. According to Bowman's testimony, McRae, Koury, Monk, and Moore would testify that she had no connection with the Congressional race; Pines and Fisher would testify that Bowman did not attend any meeting held to discuss distribution of money in the election; Leach and Wilson would testify that neither of them contacted Bowman, that she did not work for either of them, and that she knew them "by face" only; and Sistrunk would testify that he worked for Leach in the election and that Bowman did not attend any meetings concerning distribution of money.

The magistrate held that Bowman was financially unable to pay the cost of having these witnesses appear and determined that McRae, Koury, Pines, and Sistrunk were necessary to an adequate defense of Bowman. As to Monk, Fisher, Moore, Leach,

and Wilson, the magistrate found that their testimony would be cumulative or that a satisfactory showing of necessity had not been made. The district judge adopted the magistrate's findings and denied Bowman's Rule 17(b) motion except as to McRae, Koury, Pines, and Sistrunk with defense counsel allowed to renew the request at the close of the government's case. Defense counsel did not renew the motion because, as he explained at oral argument, he felt doing so would be useless since he was locked into a trial by then and had not even talked to those witnesses.

When summoned, McRae and Pines, out of the jury's presence, asserted their Fifth Amendment privilege as to any evidence which would be relevant to Bowman's case. The court denied defendant's request that the witnesses be required to invoke the Fifth Amendment in the presence of the jury, relying on *United States v. Lacouture*, 495 F.2d 1237 (5th Cir.), *cert. denied*, 419 U.S. 1053, 95 S.Ct. 631, 42 L.Ed.2d 648 (1974).

## II

*Constitutionality of 42 U.S.C. § 1973i(c)*

■ 42 U.S.C. § 1973i(c) provides:

(c) Whoever knowingly or willfully gives false information as to his name, address or period of residence in the voting district for the purpose of establishing his eligibility to register or vote, or conspires with another individual for the purpose of encouraging his false registration to vote or illegal voting, or pays or offers to pay or accepts payment either for registration to vote or for voting shall be fined not more than $10,000 or imprisoned not more than five years, or both: *Provided, however,* That this provision shall be applicable only to general, special, or primary elections held solely or in part for the purpose of selecting or electing any candidate for the office of President, Vice President, presidential elector, Member of the United States Senate, Member of the United States House of Representatives, Delegate from the Dis-

trict of Columbia, Guam, or the Virgin Islands, or Resident Commissioner of the Commonwealth of Puerto Rico.

This case is concerned solely with the specific prohibition against payments or offers of payment for voting. It should be noted that § 1973i(c) does not require that the payment be made on behalf of the federal candidate or that the voter be paid to vote for a federal candidate or that the voter in fact voted for the candidate on whose behalf he was paid; it requires only that a person be paid to vote in an election in which specified federal officers are listed on the ballot, whether alone or along with state and local candidates.

The Congressional power to regulate federal elections appears in Art. I, § 4 of the Constitution:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.

Art. I, § 8, cl. 18 augments this authority:

> [The Congress shall have Power] To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof.

Section 1973i(c) was enacted as part of the 1965 Voting Rights Act; legislative history of the Act reveals a Congressional desire to protect the integrity of a person's right to vote by protecting the integrity of that vote. *United States v. Cianciulli*, 482 F.Supp. 585, 613 (E.D.Pa.1979), quoting 111 Cong.Rec. 8423 (1965). The original version of § 1973i(c) was not limited to federal elections; the qualifying language was added because it was felt that Congress had no constitutional authority to enact legislation to prevent corruption in all elections, both state and federal. 482 F.Supp. at 613–15.

Senator Ervin, who introduced the limiting language, defined federal elections as "elections in which presidential electors and Members of the U. S. Senate and Members of the U. S. House of Representatives are chosen." *Id.* at 615, quoting 111 Cong.Rec. 8975 (1965).

As far as our research reveals, there have been only four reported cases dealing with § 1973i(c),[2] and only one of these, *United States v. Thompson*, 615 F.2d 329 (5th Cir. 1980), was brought under the vote-buying part of the statute. In that case, Thompson, the incumbent sheriff of Randolph County, Alabama, was convicted of buying votes in the September 1978 runoff election which he won. *Id.* at 330. Apparently, Thompson directed the vote-buying efforts toward his own race for sheriff, a purely local election, with no attempt made to influence the federal race; however, the names of candidates for the office of United States Senator were on the ballot along with the names of candidates for the local sheriff's office. *Id.* at 330 n.1. In a footnote, the Court quoted § 1973i(c) and merely noted that federal candidates had been listed on the ballot along with the local candidates. To compound our difficulties with the instant appeal, the issue of the constitutionality of § 1973i(c) was not there raised on appeal, and, of course, this Court did not decide the issue.

Bowman concedes that Congress may make laws regulating federal elections; she also concedes that Congress may pass laws affecting state elections where the conduct sought to be regulated affects *both* the state and federal elections. However, she contends that Congress has stepped beyond its constitutional bounds when it seeks to regulate conduct which affects only a state or a local election. According to Bowman's argument, it does not necessarily follow from the fact that federal candidates and state candidates are included on the same ballot that the federal election is affected by corrupt activities directed toward the

---

**2.** The four cases are *United States v. Lewin*, 467 F.2d 1132 (7th Cir. 1972); *United States v. Barker*, 514 F.2d 1077 (7th Cir. 1975); *United* States *v. Thompson*, 615 F.2d 329 (5th Cir. 1980); and *United States v. Cianciulli*, 482 F.Supp. 585 (E.D.Pa.1979).

local election; rather, a specific intent to influence the federal election must be shown before a statute such as § 1973i(c) may constitutionally be applied. If proof of such a specific intent is not required in a case where both federal and state candidates are included on the same ballot, then, as Bowman argues, § 1973i(c) violates the Tenth Amendment principle of federal-state relations explicated in *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). However, reliance by appellant on *Usery* is singularly inappropriate since the Supreme Court expressly refused to decide whether the result would be different if Congress were exercising authority granted it under other sections of the Constitution, such as the spending power, Art. I, § 8, or § 5 of the Fourteenth Amendment. 426 U.S. at 852 n.17, 96 S.Ct. at 2474.

Bowman argues that she intended to help *only* the local candidate for whom she was working, not the Congressional candidate listed on the slip of paper; the Congressional candidate simply received a "free ride." Bowman's argument is actually based on non-existent facts; she turns a blind eye toward the evidence at trial that the slips of paper she handed to voters also carried the voting machine number of a candidate for Congress, that all voters testified that Bowman, prior to handing out the slips of paper, said they would be paid for voting, either five dollars or some "change", that one witness testified that payment was contingent upon voting for the specified numbers, and that the promise of payment was not limited to voting for the local candidates. Clearly, even though Bowman was paid to drive by local candidates and may have only intended to help the local candidates, the effect of the slips of paper reached beyond the local races and included the federal race. Therefore, the question here is *not* whether § 1973i(c) would apply, or could be constitutionally applied, if only a local candidate's voting machine number had been on the paper. Defined by the evidence at trial, the question becomes whether Congress has the constitutional power to regulate activity which affects both the federal and the local races appearing on the same ballot.

This being true, the case fits within prior precedents concerning the Congressional power to regulate federal elections. It is clear that Congress may regulate federal elections so as to prevent violence, fraud, and corruption:

That a government whose essential character is republican, whose executive head and legislative body are both elective, whose most numerous and powerful branch of the legislature is elected by the people directly, has no power by appropriate laws to secure this election from the influence of violence, of corruption, and of fraud, is a proposition so startling as to arrest attention and demand the gravest consideration.

If this government is anything more than a mere aggregation of delegated agents of other States and governments, each of which is superior to the general government, it must have the power to protect the elections on which its existence depends from violence and corruption.

If it has not this power it is left helpless before the two great natural and historical enemies of all republics, open violence and insidious corruption.

*Ex parte Yarbrough*, 110 U.S. 651, 657–58, 4 S.Ct. 152, 154–55, 28 L.Ed. 274 (1884).

According to *Smiley v. Holm*, 285 U.S. 355, 52 S.Ct. 397, 76 L.Ed. 795 (1932), the words "times, places and manner of holding elections for Senators and Representatives" are the basis of Congressional authority

to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns; in short, to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved.

285 U.S. at 366, 52 S.Ct. at 399; see also *Buckley v. Valeo,* 424 U.S. 1, 13, 96 S.Ct. 612, 631, 46 L.Ed.2d 659 (1976); *Burroughs and Cannon v. United States,* 290 U.S. 534, 545, 54 S.Ct. 287, 290, 78 L.Ed. 484 (1934).

■ It is equally clear that the fact that a state decides to hold its elections on the same day as federal elections does not deprive Congress of the right to legislate on matters affecting the federal races. *Ex parte Siebold,* 100 U.S. 371, 393, 25 L.Ed. 717 (1879). *Siebold* limits this power by excluding from Congressional authority actions "having exclusive reference to the election of State or county officers . . . ." 100 U.S. at 393. *Yarbrough* also speaks of the Congressional power to regulate the federal election when held on the same day as state elections:

> Will it be denied that it is in the power of that body to provide laws for the proper conduct of those elections? To provide, if necessary, the officers who shall conduct them and make return of the result? And especially to provide, in an election held under its own authority, for security of life and limb to the voter while in the exercise of this function? Can it be doubted that Congress can by law protect the act of voting, the place where it is done, and the man who votes, from personal violence or intimidation and the election itself from corruption and fraud?

> If this be so, and it is not doubted, are such powers annulled because an election for State officers is held at the same time and place? Is it any less important that the election of members of Congress should be the free choice of all the electors because State officers are to be elected at the same time?

> These questions answer themselves . . . .

110 U.S. at 661–62, 4 S.Ct. at 157.

In *In re Coy,* 127 U.S. 731, 8 S.Ct. 1263, 32 L.Ed. 274 (1888), the defendants were charged with interfering with the duties of election officers by inducing them to take the election records to persons who had no authority under state law to receive them;

such actions gave the persons who wrongfully took charge of them the opportunity to open, examine, and falsify them, thus violating federal statutes which prohibited such conduct "at any election for Representative or Delegate in Congress." 127 U.S. at 748–51, 8 S.Ct. at 1267–1269. The defendants' principal argument on appeal was that the indictment was faulty in that it contained no averment that the intent and purpose of defendants' conduct was to affect the election of a member of Congress or to influence returns relating to that office; they maintained that their actions were directed only to the election of state and local candidates. *Id.* at 753, 8 S.Ct. at 1269. They further maintained that the legislation, since it did not require an intent to affect a Congressional election, went beyond the Congressional power to regulate the election of representatives and senators. *Id.* In short, the defendants interpreted the statute under which they were indicted as requiring not only a general evil intent to tamper with the election records but also a specific intent to affect the Congressional race by the tampering. *Id.* The Court rejected this argument:

> The object to be attained by these acts of Congress is to guard against the danger, and the opportunity, of tampering with the election returns, as well as against direct and intentional frauds upon the vote for members of that body. The law is violated whenever the evidences concerning the votes cast for that purpose are exposed or subjected in the hands of improper persons or unauthorized individuals to the opportunity for their falsification, or to the danger of such changes or forgeries as may affect that election, whether they actually do so or not, and whether the purpose of the party guilty of thus wresting them from their proper custody and exposing them to such danger might accomplish this result.

> \*   \*   \*   \*   \*   \*

> The manifest purpose of both systems of legislation is to remove the ballot-box as well as the certificates of the votes cast

from all possible opportunity of falsification, forgery, or destruction; and to say that the mere careless omission, or the want of an intention on the part of persons who are alleged to have acted feloniously in the violation of those laws, excuses them because they did not intend to violate their provisions as to all the persons voted for at such an election, although they might have intended to affect the result as regards some of them, is manifestly contrary to common sense and is not supported by any sound authority.

*Id.* at 754–55, 8 S.Ct. at 1270.

Two Seventh Circuit cases upholding convictions under the registration portions of § 1973i(c) follow *Coy* in their treatment of the specific intent issue. In *United States v. Lewin,* 467 F.2d 1132 (7th Cir. 1972), the indictment charged the defendants with offering to pay and paying persons to register to vote at elections in the State of Illinois including elections for president, vice-president, senator, and representative. *Id.* at 1136. Defendants charged that this indictment was fatally defective since it was not restricted to registration for elections for the specified federal officials, but included registration for all elections in the state. *Id.* The court rejected this argument as without merit since permanent voter registration in Illinois carried with it the privilege of voting in both federal and non-federal elections. *Id.;* see also *United States v. Cianciulli,* 482 F.Supp. 585, 617–18 (E.D. Pa.1979) (§ 1973i(c) includes false voter registrations occurring in both federal and non-federal election years because the act of registering, whether or not it occurs in the same year as a federal election, creates an eligibility to vote in a federal election; illegal voting activities using false information are covered only when they occur in conjunction with a federal election). Thus, corrupt practices in the Illinois permanent voter registration would have equal impact upon the federal and the non-federal election.

In *United States v. Barker,* 514 F.2d 1077 (7th Cir. 1975), defendant Reed was convicted under § 1973i(c) of knowingly submitting a ballot application which contained false information concerning his residence for the purpose of establishing his eligibility to vote in the March 21, 1972, primary election. *Id.* at 1078. In that primary, Reed was particularly interested in the races for nominations for governor and State's Attorney for Cook County, but presidential and senatorial candidates were also selected at the same time. *Id.* at 1079. Evidence at trial established that Reed voted in the Senate race. *Id.* at 1080. Section 1973i(c) was held applicable since it was undisputed that the March 21 primary election was held in part for the purpose of selecting a candidate for President. *Id.*

■ The cases just discussed can be distilled into one basic proposition: under the Constitution, Congress may regulate "pure" federal elections, but not "pure" state or local elections; when federal and state candidates are together on the same ballot, Congress may regulate any activity which exposes the federal aspects of the election to the possibility of corruption, whether or not the actual corruption takes place and whether or not the persons participating in such activity had a specific intent to expose the federal election to such corruption or possibility of corruption.

■ The Necessary and Proper Clause, Art. I, § 8, cl. 18, leaves to Congress the choice of means by which its constitutional powers are to be carried into execution. *United States v. Classic,* 313 U.S. 299, 320, 61 S.Ct. 1031, 1040, 85 L.Ed. 1368 (1941). As Chief Justice Marshall explained in *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 420, 4 L.Ed. 579 (1819):

Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.

The Supreme Court recognized the dangers of electoral corruption in *Yarbrough*: This duty [protecting the right to vote] does not arise solely from the interest of the party concerned, but from the neces-

sity of the government itself, that its service shall be free from the adverse influence of force and fraud practised on its agents, and that the votes by which its members of Congress and its President are elected shall be the *free* votes of the electors, and the officers thus chosen the free and uncorrupted choice of those who have the right to take part in that choice.

\*    \*    \*    \*    \*    \*

It equally affects the government, it is as indispensable to the proper discharge of the great function of legislating for that government, that those who are to control this legislation shall not owe their election to bribery or violence. . . .

*Ex parte Yarbrough, supra,* 110 U.S. at 662–63, 4 S.Ct. at 157–58.

It is clearly evident here that Congress realized the evils of a manipulated electorate and tainted results and chose 42 U.S.C. § 1973i(c) as the means to overcome this public evil in those instances wherein it does, or could, infect a federal election. According to *Coy,* the erection of barriers to a potential threat to the federal electoral process is a proper exercise of the Congressional power to regulate federal elections. 127 U.S. at 754, 8 S.Ct. at 1270. With payments being made for voting, voters who might otherwise not have voted are brought into the electoral pool; the voters who are paid are subject to manipulation by the parties who paid them; the election thus becomes a spending contest with the candidate most willing and able to make such payments having the greatest chance of winning. The fact that the person making the payment did not intend to influence the federal election does not change the reality of the threat; the payment itself, *not* the purpose for which it is made, is the harm and the gist of the offense. With federal and state elections held on the same day and with all candidates listed on one ballot, it is impossible to isolate a threat to the integrity of the state electoral process from a threat to the integrity of the federal contest.

Although Bowman claims that her only intent was to manipulate the local election,

her actions, nonetheless, still had the definite potential to alter the outcome of the federal race. Persons who were being paid for the act of voting were brought to the polls, where, on one ballot, they had the opportunity to vote for both state and federal candidates. These paid voters, subject to ready manipulation, were handed slips of paper with the voting machine numbers of both state and federal candidates. Her actions did not, in the words of *Siebold,* have exclusive reference to the election of state or local candidates. Because of her payments, persons went to the polls who might otherwise not have voted in the federal contest, and each race, local, state, and federal, was equally exposed to the possibility that the result might have been different had the paid voters not voted.

The language of the statute is clear; no specific intent to interfere with the federal races on a ballot containing federal, state, and local races is required. The only way to prevent corruption in federal elections with any reasonable possibility of success, indeed, the means that Congress has chosen, is to foreclose all chances of exposure by prohibiting corrupt practices anytime a federal candidate is on the ballot. Congress has made this decision, and, since the end is legitimate and the means appropriate, the courts cannot, and will not, condemn it.

█ We hold that 42 U.S.C. § 1973i(c) is constitutional as applied to the facts of this case as an exercise of the Congressional power to regulate federal elections by regulating activities which have the potential to affect such elections. We are not called on to decide, and we do not decide, whether § 1973i(c) would apply if only the numbers of state or local candidates had been on the slips of paper. We do decide that § 1973i(c) may be constitutionally applied to prohibit any activity that has the potential to affect the integrity and purity of a federal election where both federal and the state or local races are on the ballot and that a specific intent to corruptly influence the federal race need not be proven.

### III

#### *Other Issues*

Once the constitutional issue is decided, the other issues are easily resolved. Bowman's argument concerning the jury instruction and the denial of her Rule 17(b) motion as to certain witnesses was based upon her interpretation of § 1973i(c), an interpretation we have rejected. The District Court did not err in refusing to instruct the jury that it must find that Bowman paid or offered to pay persons to vote for a Congressional candidate.

Our interpretation of § 1973i(c) also decides the question of the partial denial of Bowman's Rule 17(b) motion. The decision to grant or deny a Rule 17(b) motion is vested in the sound discretion of the trial court. *United States v. Jones*, 580 F.2d 785, 787 (5th Cir. 1978). The trial court's discretion is limited only by the defendant's Sixth Amendment right to protection against unreasonable discrimination, that is, as between those financially able and those financially unable to pay witness fees, there should be no more discrimination than is necessary to protect against abuse of process. *United States v. Hathcock*, 441 F.2d 197, 199 (5th Cir. 1971). The test to be used is that if the defendant avers facts which, if true, would be relevant to any issue in the case, the subpoena request must be granted unless the averments are facially incredible or the prosecution shows, either by independent evidence or matters on the record, that the averments are untrue or the request is frivolous. *Id.* at 199–200. The district court, in its discretion, may refuse to subpoena witnesses whose testimony would be cumulative or whose testimony would not be relevant since irrelevant testimony is *per se* not "necessary to an adequate defense." *United States v. Romano*, 482 F.2d 1183, 1195 (5th Cir. 1973), *cert. denied sub nom. Yassen v. United States*, 414 U.S. 1129, 94 S.Ct. 866, 38 L.Ed.2d 753 (1974).

All of the witnesses for whom appellant was denied subpoenas without cost (Monk, Fisher, Moore, Leach, and Wilson) would have testified only that Bowman did not work for a Congressional candidate in the election, that she had no connection with the federal race, and that she did not attend meetings concerning distribution of money to be used in the election. The witnesses she was allowed to subpoena and who did not assert the Fifth Amendment at trial, Sistrunk and Koury, testified that Bowman had no connection with the federal race and that she was paid to drive by a local candidate. Thus, the testimony of the other witnesses would have been both irrelevant since a purpose, motive, and intent to make the payments on behalf of a Congressional candidate need not have been proven in this § 1973i(c) prosecution and cumulative since testimony concerning Bowman's non-connection with the federal race did go to the jury. Therefore, assuming without deciding that Bowman could raise the denial of her 17(b) motion without renewing it at the close of the prosecution's case,[3] we hold that the trial judge did not abuse his discretion in partially denying the motion.

There is strong Fifth Circuit precedent against allowing witnesses to assert the Fifth Amendment in the jury's presence. The general rule is that once the trial court has satisfied itself as to the validity of the witness's Fifth Amendment claim, it may, in its discretion, decline to place the witness on the stand for the purpose of eliciting a claim of privilege. *United States v. Bolts*, 558 F.2d 316, 324 (5th Cir. 1977), *cert. denied*, 439 U.S. 898, 99 S.Ct. 262, 58 L.Ed.2d 245 (1978); *United States v. Tuley*, 546 F.2d 1264, 1268 n.7 (5th Cir.), *cert. denied*, 434 U.S. 837, 98 S.Ct. 128, 54 L.Ed.2d 99 (1977); *United States v. Lacouture*, 495 F.2d 1237, 1240 (5th Cir.), *cert. denied*, 419 U.S. 1053, 95 S.Ct. 631, 42 L.Ed.2d 648 (1974). According to *Lacouture*, neither side has the right to benefit from any inference which the jury may draw from the witness's assertion

---

**3.** Neither party raised this issue in the written briefs on appeal, although the government did mention it on oral argument with the appellant,

in rebuttal, explaining why the motion was not renewed, and we therefore decline to decide the issue.

of the privilege either alone or in conjunction with any question that he was asked because such inferences are of dubious probative value and have a high potential for prejudice. 495 F.2d at 1240. The court also noted that "a claim of Fifth Amendment protection is likely to be regarded by the jury as high courtroom drama and a focus of ineradicable interest, when in fact its probative force is weak and it cannot be tested by cross-examination." *Id.*[4]

■ Bowman argued that the most likely inference that the jury could have drawn from such an assertion would have been that her actions were confined to the non-federal election. This inference is, first of all, irrelevant since, under our interpretation of § 1973i(c), actions that have the potential to affect the federal race are within the prohibition of that section. The inference suggested by Bowman also seems, at best, unreliable and tenuous, although it does seem likely that, from McRae's and Pine's assertion of the privilege, the jury could have inferred that they were connected with a scheme to buy votes on behalf of a federal candidate. The further inference of Bowman's non-connection is questionable since the jury could just as reasonably have inferred that they were involved in the scheme along with Bowman. Therefore, the district court did not abuse its discretion in refusing to allow McRae and Pines to assert their Fifth Amendment privilege in the presence of the jury.

AFFIRMED.

---

**4.** Appellant attempted to distinguish *Lacouture* on grounds that the witness claiming the privilege was not subpoenaed by the defendant. However, this attempt must fail because the *Lacouture* court, in its opinion and on petition for rehearing, said that, assuming Lacouture had subpoenaed the witness, her rights under the subpoena would have been exhausted by the witness's physical availability at court and could not override the witness's privilege against compulsory self-incrimination. 495 F.2d at 1240, 1241.