**UNITED STATES of America, Plaintiff-Appellee,**

v.

**E. B. MALMAY, Defendant-Appellant.**

No. 81–3068.

United States Court of Appeals, Fifth Circuit.

March 31, 1982.

of clarity and to avoid further confusion upon remand.

John R. Martzell, New Orleans, La., for defendant-appellant.

Dosite H. Perkins, Jr., Asst. U. S. Atty., Shreveport, La., for plaintiff-appellee.

Before COLEMAN, REAVLEY, and SAM D. JOHNSON, Circuit Judges.

SAM D. JOHNSON, Circuit Judge:

This case arises on appeal from a seven-count conviction of defendant-appellant E. B. Malmay for conspiracy to violate 42 U.S.C. § 1973i(c), the vote-buying provision of the Voting Rights Act of 1965. Malmay, a candidate in a local school board election in Sabine Parish, Louisiana, gave "haulers" enough money to pay voters five dollars each after being returned from a trip to the polls where they voted. Although Malmay did not explicitly instruct voters how to vote, he clearly intended to influence the outcome of the local school board election. No evidence was introduced which indicated any intent to influence the federal election which was held at the same time as the school board election. The district court in essence held that the actions of the defendant had the potential to affect the federal election and that such potential was within the prohibition of the statute. We affirm.

I. *Background*

The indictment of Malmay grew out of a much larger investigation by the Federal Bureau of Investigation of vote-buying schemes in western Louisiana. Most notable among the indictments resulting from the investigation was a Congressman from the Fourth Congressional District, a sitting state district judge, a district attorney, and

an assistant district attorney. One case arising out of this investigation—*United States v. Bowman*, 636 F.2d 1003 (5th Cir. 1981)—bears heavily upon the case *sub judice*. The scheme in *Bowman* took place at about the same time that the instant case had its inception, and occurred in neighboring Vernon Parish, Louisiana. There the vote-buying scheme was also conducted to influence the outcome of a local school board election. In that case, slips of paper were given to the paid voters which indicated the local and federal candidates for which ballots were to be cast by the paid voters. The *Bowman* court stated:

> We are not called on to decide, and we do not decide, whether § 1973i(c) would apply if only the numbers of state or local candidates had been on the slips of paper. We do decide that § 1973i(c) may be constitutionally applied to prohibit any activity that has the potential to affect the integrity and purity of a federal election where both federal and the state or local races are on the ballot and that a specific intent to corruptly influence the federal race need not be proven.

The critical events in the case *sub judice* focus on Saturday, September 16, 1978, the date of the primary election in Zwolle, Sabine Parish, Louisiana. Malmay, a local businessman and member of the Sabine Parish School Board for about fifteen years, was running for re-election. His opponent, Sammy D. Cross, was a black, who had formerly been a principal of a school in Sabine Parish. In what was described as a long tradition of voter "hauling" in Zwolle, Malmay approached several school employees and others before the election to help transport voters to the polls. Many of the voters were poor and minimally educated blacks, who would not or could not otherwise have voted.

In response to allegations at trial that he not only hauled voters to the polls, but also paid them to vote, Malmay asserted that three elements necessary to convict him were missing. First, he asserted he had no intent to pay voters, only to pay the persons hauling the voters· for their services.

Second, he argued that no actual exchange of money for votes was made at his direction. Third, he argued that, unlike the *Bowman* case, the persons transported were given no slips of paper instructing them which of the federal candidates to vote for. Malmay further testified under oath that despite his long acquaintance with Zwolle politics, he had never heard of vote-buying in all his years in the town of Zwolle. Record, at 515.

The testimony of a series of witnesses proved quite damaging to the credibility of Malmay's assertions, however. In the light most favorable to the Government, this evidence demonstrated not only that Malmay intended to influence the local election by buying votes, but also that actual payments of money for votes occurred. Illustrative of the evidence presented was the testimony of three haulers hired by Malmay to carry voters to the polls on the primary election of September 16, 1978.

Perhaps most damaging to Malmay was testimony of Bertha Garner, a high school teacher in Zwolle whose husband was the bus supervisor for the school district. Garner related that the day before the primary election, Malmay approached her and paid her about $100, saying, "This is the money for the voters." Record, vol. III, at 150. Garner testified that she hauled voters to the polls on primary election day and paid them five or ten dollars after they voted. Shortly after Malmay's election, Garner's husband was promoted to transportation supervisor by the School Board.

Another hauler for Malmay was Lewis Lynch, also a resident of Zwolle. He pled guilty to a one-count felony of paying voters in the September 16, 1978 election. According to Lynch, Malmay came to Lynch's house about a week before the election to discuss school bus transportation for Lynch's children. During the conversation, Malmay asked Lynch to haul voters for him. A day before the election, Malmay met Lynch near Lynch's house, gave him $130, and told him to give whoever he carried to the polls five dollars. Record, vol. IV, at 246, 247. Lynch testified that on

election day he carried five or six voters to the polls and paid them five dollars each from the money Malmay had given him.

Also among the haulers that Malmay enlisted was Carolyn Cutright, a lunch room employee of the Sabine Parish School Board, who later pled guilty to one felony count of conspiracy to buy votes in a November 7, 1978 election. Cutright testified that Malmay came into the school lunch room three to four weeks before the primary election and asked her to help haul voters for him. He approached her again a week or so before the election and promised her money. The night before the election she was called to go to Malmay's house where he gave her $100 in five dollar bills. It was Cutright's understanding this money was to be used for payment to the persons she hauled. On election day, Cutright hauled a number of voters to the polls and testified to paying about eight of them five dollars each. These witnesses testified that Malmay not only intended that they pay voters, but also that this understanding was in fact carried out.

Furthermore, testimony by Joseph Martinez indicated that there was little doubt in Malmay's mind about this understanding. On the morning of the election, Martinez went into the Pelican Drug Store, which was directly across the street from the City Hall where the election was occurring and met Malmay. While they were talking, either Lewis Lynch or Carolyn Cutright came driving by and Malmay said, "That is a good bunch of voters there, James." Record, vol. V, at 346. In a few minutes, another car came by and Malmay stood up and said, "Uh-oh, we have been double-crossed. These people supposed to have voted for me, and they're in Cross's car." Malmay then stood up and said, "Mr. Cross must have been paying these people more than I pay my haulers to haul them." Malmay continued, "I'll have to pay my haulers whatever it cost to get the voters hauled

cause Cross is paying more." Record, vol. V, at 346–47.

Nowhere in this damaging testimony, however, was there any indication that Malmay was attempting to influence the federal election that was being held simultaneously. No witness testified that any of the transported voters were instructed on how or who to vote for in the federal election. Thus, the issue facing the district court was not so much whether a vote-buying scheme occurred, but whether it had a "potential to affect" the federal election. The district court determined that it did and Malmay was convicted.[1]

There are two principal issues to be addressed in this appeal: (1) whether 42 U.S.C. § 1973i(c), which prohibits payments for votes in elections held solely or in part for electing federal representatives, is applicable to the fact situation involved, and (2) whether the trial should have been transferred to another city within the same judicial district.

II. *The Applicability of 42 U.S.C. § 1973i(c)*

42 U.S.C. § 1973i(c) provides:

(c) Whoever knowingly or willfully . . . conspires with another individual for the purpose of encouraging his false registration to vote or illegal voting, or pays or offers to pay or accepts payment either for registration to vote or for voting shall be fined not more than $10,000 or imprisoned not more than five years, or both: *Provided, however*, That this provision shall be applicable to general, special, or primary elections held solely or in part for the purpose of selecting or electing any . . . [federal] candidate. . . .

As indicated, the evidence is clear that Malmay knowingly and willfully paid for voting when he gave money to haulers for the purpose of paying voters after they had voted. It is therefore apparent that Mal-

---

1. The trial judge suspended the imposition of the confinement sentence for Malmay and placed him on probation for three years. As a condition of probation, Malmay was required to abstain from any "politicking or electioneer-

ing," during the probationary period, and a fine of $5000 was imposed on each of the seven counts, the fines to be concurrent. Record, vol. II, at 350.

may did intend to influence the local election. It is equally clear that there was no showing of any intent to influence any federal candidacy. At issue, therefore, is whether Malmay's conduct is protected from federal prosecution by the proviso limiting the scope of section 1973i(c) to elections held "solely or in part" for federal officials.[2] This is the issue left open in *Bowman* where the Court stated, "We are not called on to decide, and we do not decide, whether section 1973i(c) would apply if only the numbers of state or local candidates had been on the slips of paper."

A threshold inquiry goes to the congressional intent of section 1973i(c). The term in the proviso limiting the liability to elections "held solely or in part" for the purpose of selecting federal officials would appear to embrace corruption of the primary election, even if it was only in part a federal election. Further, the legislative history supports such a reading of the statute.[3] The original version of section 1973i(c) was not limited to federal elections and the supplemental language was inserted to prevent

corruption of all elections, both state and local.

A less restrictive reading of section 1973i(c) is also inferred when this section is seen as part of the broader statutory scheme of the Voting Rights Act. A key reason for inserting this vote-buying section into the Act was to prevent the preservation of discriminatory effects by fraud at the ballot box, once more overt discriminatory practices were eliminated.[4]

*Bowman* readily occupies a dominant position in the consideration of the case *sub judice.* In *Bowman* the Court set the framework for the issue at hand:

This case is concerned solely with the specific prohibition against payments or offers of payment for voting. It should be noted that § 1973i(c) does not require that the payment be made on behalf of the federal candidate or that the voter be paid to vote for a federal candidate or that the voter in fact voted for the candidate on whose behalf he was paid; it requires only that a person be paid to vote in an election in which specified

---

**2.** Appellant poses the question for resolution by the Court

Whether 42 U.S.C. 1973i(c), barring payments for votes in elections held solely or in part for the purpose of electing federal representatives, can constitutionally be applied to such payments where the evidence established that both the intended effect and the demonstrated effect of such payments was solely upon a local, non-federal election.

**3.** The power of Congress to reach intimidation by private individuals in purely local elections derives from Article 1, Section 4, and the implied power of Congress to protect Federal elections against corrupt influences . . . While Article 1, Section 4 and the implicit power of Congress to prevent corruption in elections normally apply only to Federal elections and [section 1973i(c)] applies to all elections, these powers are primarily within their scope *and where intimidation is concerned, it is impractical to separate its pernicious effects between Federal and purely local elections.*

1965 U.S.Code, Cong. and Admin.News, 2437, 2462 (emphasis added).

**4.** It is interesting to note from the legislative history that the Republican Party's proposed voting rights bill, which tended to urge a less intrusive attack on overt discrimination in vot-

ing, nevertheless urged Congress to press hard to promote clean elections by eliminating voting frauds:

Clean elections and voting frauds

As we destroy the traditional bastions of discrimination erected at registration and polling places, we must foresee the path of retreat and reentrenchment of those who may continue to preserve the effects of discrimination on account of race or color. Surely, it will be in the form of fraud, intimidation, and corruption. Therefore, we maintain that any effective voting rights bill must include a comprehensive clean elections section. The public record is replete with endless instances of vote frauds, including stuffing the ballot box, tombstone voting, multiple casting of votes by one individual in several precincts or districts, threats and coercion of voters, destruction or alteration of ballots, willful miscounting of votes, and buying votes. These conditions do not exist in just one part of the country, but can be found in many States across the length and breadth of this land.

It is a cruel deception to give any man the elective franchise and then allow destruction of the effect of his vote through a multitude of corrupt practices.

1965 U.S.Code Cong. & Ad.News 2471.

federal officers are listed on the ballot, whether alone or along with state and local candidates.

The Congressional power to regulate federal elections appears in Art. I, § 4 of the Constitution:

The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.

Art. I, § 8, cl. 18 augments this authority:

[The Congress shall have Power] To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof.

The defendant in *Bowman* contended that a specific intent to influence the federal election must be shown before section 1973i(c) could be constitutionally applied; that without specific intent it would violate the tenth amendment principle of federal-state relations described in *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). In *Usery*, however, the Supreme Court refused to decide whether any other result would obtain if Congress were exercising authority granted under any other constitutional provision, like the spending power, article 1, section 8, or section 5 of the fourteenth amendment.

Bowman argued that her only intent was to assist local candidates, and even though federal candidates' numbers were also listed on the slips of paper supplied to the paid voters, that the federal candidates merely received a "free ride." Nevertheless, the *Bowman* court construed the effects of the defendant's action as reaching beyond the

local races and including the federal races as well. This being true, that Court determined that the issue before it was not whether section 1973i(c) could be constitutionally applied if only local races were involved, the real issue was whether Congress had the constitutional authority to regulate activity which affects both local and federal races appearing on the same ballot.

■ In this posture the *Bowman* Court determined that its issue fit within prior precedent concerning ,congressional power to regulate federal elections, and that it was clear that Congress could regulate federal elections so as to prevent violence, fraud, and corruption. "If it [the Government] has not this power, it is left helpless before the two great natural and historical enemies of all republics, open violence and invidious corruption." *Ex parte Yarbrough*, 110 U.S. 651, 658, 4 S.Ct. 152, 155, 28 L.Ed. 274 (1884). The "times, places and manner of holding elections for Senators and Representatives" (art. 1, section 4 of the Constitution) is the basis of congressional authority to enact the safeguards necessary to enforce the rights involved, *Smiley v. Holm*, 285 U.S. 355, 52 S.Ct. 397, 76 L.Ed. 795 (1932). The fact that local and federal elections are held at the same time in no way deprives Congress of the right to enact legislation affecting the federal election, *Ex parte Siebold*, 100 U.S. 371, 25 L.Ed. 717 (1879), and the courts have not historically deemed a specific intent to affect the federal election to be necessary (where the statute involved sought to protect the federal elective process). *In re Coy*, 127 U.S. 731, 8 S.Ct. 1263, 32 L.Ed. 274 (1888).[5] Taking all of the citations together, the *Bowman* court concluded:

The cases just discussed can be distilled into one basic proposition: under the Constitution, Congress may regulate

---

5. Convictions in two cases involving intent have been upheld in two Seventh Circuit cases concerning the registration portions of section 1973i(c). *United States v. Lewin*, 467 F.2d 1132 (7th Cir. 1972); *United States v. Barker*, 514 F.2d 1077 (7th Cir. 1975).

*See also United States v. Sayre, et al.*, 522 F.Supp. 973 (W.D.Mo.1981), where the district court ruled that § 1973i(c) applied to intent to corrupt in a local election held concurrently with a federal election.

"pure" federal elections, but not "pure" state or local elections; when federal and state candidates are together on the same ballot, Congress may regulate any activity which exposes the federal aspects of the election to the possibility of corruption, whether or not the actual corruption takes place and whether or not the persons participating in such activity had a specific intent to expose the federal election to such corruption or possibility of corruption. 636 F.2d at 1011.

It is quite clear that there is no specific intent requirement under section 1973i(c) to expose the federal election to corruption or even the possibility of corruption.

█ Even without a specific intent requirement there is danger in a myopic view of the paid voter process. When it occurs voters are brought to the polls who otherwise might not have voted at all. Aside from being ready instruments of further manipulation, their presence distorts the total, leaves to chance the federal candidates who might—or might not—receive their vote, distorts the results, and is, therefore, repugnant to the integrity of the elective process.

As stated by the *Bowman* Court, "We hold that 42 U.S.C. § 1973i(c) is constitutional as applied to the facts of this case as an exercise of the Congressional power to regulate federal elections by regulating activities which have the potential to affect such elections." 636 F.2d at 1012.

### III. The Denial of a Motion for Intra-District Transfer

Malmay also asserts that the district court abused its discretion in denying a Fed.R.Crim.P. Rule 18 motion for intradistrict transfer of venue to avoid prejudicial pre-trial publicity. The trial took place in the context of a series of trials in Sabine Parish, Vernon Parish, and Red River Parish, touching the Shreveport Division in the northern part of the state, and the Lake Charles Division in the southern part of the state. The trials were the culmination of the FBI's large-scale investigation into vote-buying schemes and the investigation

was hailed as "story of the year" by the *Shreveport Times*. Professor Edward Renwick, Director of the Institute of Politics at Loyola University in New Orleans, conducted four polls of 200 registered voters each in the areas of Shreveport, Monroe, Lake Charles, and Alexandria, Louisiana, after the vote-buying investigation was under way. The poll reflected that in Shreveport, the area where the district court was sitting, forty-eight percent of those polled believed charges of vote buying they had read, seen, or heard about were true, while only seven percent believed them to be false.

Nevertheless, there was very little awareness of Malmay individually among the voter sample, with only fourteen percent claiming to have heard of Malmay in all four polls as whole. Asked whether Malmay was innocent or guilty, one percent of those polled said he was innocent, five percent said he was guilty, ninety-two percent said they did not know, and two percent refused to answer. Record, vol. I, at 50. This poll was conducted several months after Congressman Leach, the most well-known of the vote-buying defendants, had been acquitted. Record, vol. I, at 61. Nevertheless, the poll reflected a high degree of cynicism about the voting process. Overall, about forty-five percent of those polled believed there was vote buying in the area, combining the "a lot" and "a little" categories. In Shreveport, forty percent of those polled believed there was buying of votes on a regular basis.

Malmay contends that the unabating barrage of publicity surrounding the vote-buying investigations generally created a "latent bias" among the jurors sitting in the Shreveport area. Fed.R.Crim.P. Rule 21(a) sets forth the general standard for change of venue across districts. This rule allows the court to transfer venue when there is

> so great a prejudice against the defendant that he cannot obtain a fair and impartial trial at any place fixed by law for holding court in that district.

Under Fed.R.Crim.P. Rule 18 the district court may transfer venue within the district

(an option not spelled out explicitly in Rule 18, but stated by the Advisory Committee in 1966 Amendments to the Rule). Therefore, the district court had the discretion to move the trial to another court within the district.

■ The district court was not, however, required to move the trial absent a strong showing of prejudice. Courts have generally felt that voir dire examination is the appropriate mechanism for screening jurors to avoid bias. According to the due process standards established in *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), the Constitution does not entitle a criminal defendant to a trial by a body of jurors ignorant of all facts surrounding a case, but only an impartial jury that will render a verdict based exclusively on the evidence presented in the court. Furthermore, this Court must apply the abuse of discretion standard to district court rulings on Rule 18—a standard which requires almost a compelling reason to believe the jury was biased by pre-trial publicity.

■ In the jury selection process employed, the district court addressed prospective jurors three at a time outside of the presence of the other members of the panel and asked them general questions. If any one of the three prospective jurors indicated they knew the appellant, or had any preconceived judgment in respect to vote-buying, or the like, that person would be questioned at greater length outside the presence of the other two. No juror was accepted that had any prejudice in particular from pre-trial publicity.

Malmay bases his pre-trial publicity charge mainly on the public opinion polls of registered voters in Shreveport and three other cities within the Western District of Louisiana and the Fourth Congressional District. While almost one-half of those surveyed felt that charges of vote buying were true in general, the defense concedes that a significant proportion of the population reflected in these surveys did not acknowledge a prejudgment of Malmay. The defendant nevertheless alleges the difficulty of separating out the large percentage of persons who had prejudged the case and found bias. The allegation of impossibility in ferreting out such latent bias in half the population is not a strong argument, especially in view of the fact that voir dire examination revealed no such bias in the jurors interrogated. Therefore, there does not appear to be any substantial ground for overturning the district court's denial of an intradistrict transfer, even though that might have been a reasonable and prudent measure to avoid any effects of the publicity.

## V. *Conclusion*

It is the opinion of this Court that Malmay's actions fall within 42 U.S.C. § 1973i(c), which states that anyone who "pays or offers to pay ... for voting shall be fined not more than $10,000 or imprisoned not more than five years, or both." The decision of the district court is

AFFIRMED.