UNITED STATES of America, Plaintiff–Appellee,

v.

Davis COLE, also known as Cozy Cole, Defendant–Appellant.

No. 92–1880.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 14, 1994.

Decided Nov. 28, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied Jan. 30, 1995.

Joseph Hartzler, Office of U.S. Atty., Springfield, IL, Daniel P. Butler (argued), Dept. of Justice, Crim. Div., Public Integrity Sect, Washington, DC, for plaintiff-appellee.

Leonard C. Goodman, Chicago, IL (argued), Michael J. Costello, Costello Law Office, Springfield, IL, for defendant-appellant.

Before GODBOLD,* WOOD and COFFEY, Circuit Judges.

GODBOLD, Circuit Judge.

Davis Cole was convicted by a jury of one count of conspiracy to commit election fraud in violation of 18 U.S.C. § 371 and one count of multiple voting in violation of 42 U.S.C. § 1973i(e) and (c).[1] He was sentenced to 46 months imprisonment. We affirm the conviction and the sentence.

## BACKGROUND

Cole was a deputy voter registrar in Springfield, Illinois, and, as such, he was authorized to register voters and to assist qualified voters in obtaining absentee ballots. In March 1990 he was a candidate in the Democratic primary election for Democratic precinct committeeman for a Springfield precinct. The incumbent, Edna Tyler, opposed him. The primary was a joint state and federal election, but there were only two candidates for federal office on the ballot, one for the Democratic nomination for U.S. senator and the other for the Democratic nomination for a U.S. House of Representatives seat. Each was unopposed. Cole won his race with 100 votes to Tyler's 75. Eighty-eight votes were cast in the form of absentee ballots.

At trial the government called 19 witnesses who testified that in the primary Cole and/or one of his associates improperly influenced their voting by absentee ballots. Most of these witnesses testified that Cole instructed them on how to apply for an absentee ballot, and that he came to their residences a second time after the ballot arrived in the mail. Absentee voters testified that they signed

---

* The Honorable John C. Godbold, Circuit Judge for the United States Court of Appeals for the Eleventh Circuit, is sitting by designation.

1. Section 1973i(c):

   **(c) False information in registering or voting; penalties**
   Whoever knowingly or willfully gives false information as to his name, address, or period of residence in the voting district for the purpose of establishing his eligibility to register or vote, or conspires with another individual for the purpose of encouraging his false registration to vote or illegal voting, or pays or offers to pay or accepts payment either for registration to vote or for voting shall be fined not more than $10,000 or imprisoned not more than five years, or both: *Provided, however,* That this provision shall be applicable only to general, special, or primary elections held solely or in part for the purpose of selecting or electing any candidate for the office of President, Vice President, presidential elector, Member of the United States Senate, Member of the United States House of Representatives, Delegate from the District of Columbia, Guam, or the Virgin Islands, or Resident Commissioner of the Commonwealth of Puerto Rico.
   Section 1973i(e):
   **(e) Voting more than once**
   (1) Whoever votes more than once in an election referred to in paragraph (2) shall be fined not more than $10,000 or imprisoned not more than five years, or both.
   (2) The prohibition of this subsection applies with respect to any general, special, or primary elections held solely or in part for the purpose of selecting or electing any candidate for the office of President, Vice President, presidential elector, Member of the United States Senate, Member of the United States House of Representatives, Delegate from the District of Columbia, Guam, or the Virgin Islands, or Resident Commissioner of the Commonwealth of Puerto Rico.
   (3) As used in this subsection, the term "votes more than once" does not include the casting of an additional ballot if all prior ballots of that voter were invalidated, nor does it include the voting in two jurisdictions under section 1973aa–1 of this title, to the extent two ballots are not cast for an election to the same candidacy or office.

only their names on the ballots while Cole, or his associate, or an unknown person, filled in the remaining information and votes by punching the ballot. Additionally, several witnesses testified that they were given beer or cigarettes from Cole or his associate, and one witness testified she also received a dollar in addition to cigarettes.

After conviction, the district court added a total of eight points to Cole's offense level for: organizing or leading a conspiracy of at least 15 persons (four points); abusing a position of public trust (two points); and obstructing justice by attempting to coerce witnesses (two points). With an offense level of 20 and a criminal history level of II, the U.S.S.G. mandated a sentencing range of 37 to 46 months incarceration. The district court sentenced Cole to 46 months on each count concurrent.

## DISCUSSION

### 1. *Federal Jurisdiction in a Mixed Election*

■ We hold that the federal district court had jurisdiction although the election, a mixed federal/state election, had only two federal candidates running unopposed. Cole concedes that the Constitution empowers Congress to regulate mixed federal/state elections but contends that the reach of the statute is limited to elections in which a federal candidate is opposed. We hold that § 1973i(c) is designed to protect the integrity of the federal election process and that the integrity of a mixed election can be marred regardless of whether federal candidates are opposed.

In *Blitz v. U.S.*, 153 U.S. 308, 14 S.Ct. 924, 38 L.Ed. 725 (1894), the defendant falsely registered his name and address for voting in a mixed federal/state election. The Supreme Court stated that the statute involved, § 5511 of the Revised Statutes of the United States, was concerned with a voter's fraudulent conduct that "affected or might affect the integrity of the election" of a federal candidate. *Id.* at 314, 14 S.Ct. at 926. Section 5511 referred specifically to an election of a "representative or Delegate in Congress," and the indictment did not clearly indicate that the defendant had voted for a federal candidate. The Court stated:

Voting, in the name of another, for a state officer, cannot possibly affect the integrity of an election for Representative in Congress.... [A]n indictment under Rev. Stat. § 5511 for knowingly personating and voting under the name of another, should clearly show that the accused actually voted for a Representative in Congress....

*Id.* at 314–15, 14 S.Ct. at 926–27. Section 5511 was, however, narrower than the voting fraud statute before us, which prohibits voting fraud in "elections held solely or *in part*" for the purpose of electing federal candidate officials. 42 U.S.C. § 1973i(c) (emphasis added). Section 5511 contained no "in part" provision.

*U.S. v. Bowman,* 636 F.2d 1003 (5th Cir. Unit A Feb. 1981), involved a vote buying scheme whereby voters were paid small amounts of cash to vote for specific candidates, including a federal candidate, in a mixed federal/state election. *Id.* at 1009. Considering whether § 1973i could be applied to the facts, the Fifth Circuit determined that intent on the part of the defendant to affect the federal election was not required. The court considered the history of the statute, noted that Congress intended "to protect the integrity of a person's right to vote by protecting the integrity of that vote," *id.* at 1008, and concluded that "the payment itself, *not* the purpose for which it is made, is the harm and the gist of the offense," *id.* at 1012.

*U.S. v. Carmichael,* 685 F.2d 903 (4th Cir. 1982), *cert. denied,* 459 U.S. 1202, 103 S.Ct. 1187, 75 L.Ed.2d 434 (1983), stemmed from another vote buying scheme in a federal/state election. Like the court in *Bowman,* the Fourth Circuit held that the government did not have to prove that the defendant's actions actually affected the federal election, but only that "a defendant bought or offered to buy a vote and that such activity 'expose[d] the federal aspects of the election to the possibility of corruption.'" *Id.* (citation omitted).

*U.S. v. Howard,* 774 F.2d 838 (7th Cir. 1985), is a mixed election case in which a U.S. House of Representative seat was the only

federal position contested. The defendant contended that § 1973i(c) was not applicable to his conduct because, while he falsified his address in order to vote in state races by showing himself as residing in a precinct in which he did not live, he did reside within the Congressional district and was entitled to vote in the only federal contest on the ballot. Therefore his act of registering and voting at the false address had no impact on the federal part of the election. Thus, he said, his fraudulent address did not affect the federal election because his true address permitted him to vote for the House of Representatives seat without committing fraud. This court held that § 1973i was applicable. "[T]he language of section 1973i(c) does not require the government to prove that the prohibited conduct had an actual or potential impact on the *result* of the federal contest. In fact, [the defendant's] conduct falls squarely within the express terms of the statute." 774 F.2d at 843 (citation omitted).

■ Thus we see that § 1973i is designed to protect two aspects of the federal election: the actual results of the election and the integrity of the process of electing federal officials. The Supreme Court in *Blitz* observed that § 5511 was concerned with the integrity of federal elections as well as the results. 153 U.S. at 314, 14 S.Ct. at 926. Likewise, the courts in *Bowman,* 636 F.2d at 1012, and *Carmichael,* 685 F.2d at 908, remarked that the fraudulent behavior did not have to affect the federal election. The *Bowman* court continued: "§ 1973i(c) may be constitutionally applied to prohibit any activity that has the potential to affect the integrity and purity of a federal election where both federal and the state or local races are on the ballot. . . ." 636 F.2d at 1012. Cole's fraudulent behavior may not have had an actual impact on the uncontested federal election, but his behavior did have an impact on the *integrity* of the election.

The legislative history accords with our analysis. Section 1973i originated as a section of the comprehensive Voting Rights Act of 1965. That act was designed "primarily to enforce the 15th amendment to the Constitution of the United States and [was] also designed to enforce the 14th amendment and article I, section 4 [of the Constitution]." H.R.Rep. No. 439, 89th Cong., 1st Sess. (1965), *reprinted in* 1965 U.S.C.C.A.N. 2437, 2437. The House Judiciary Committee noted that "[t]he public record is replete with endless instances of vote frauds, including stuffing the ballot box, tombstone voting, multiple casting of votes by one individual in several precincts or districts, threats and coercion of voters, destruction or alteration of ballots, willful miscounting of votes, and buying votes." *Id.* at 2471. To meet the congressional purposes the members of the House Judiciary Committee deemed it imperative that the Act include methods for enforcing clean elections. "It is a cruel deception to give any man the elective franchise and then allow destruction of the effect of his vote through a multitude of corrupt practices. . . . [W]e are obligated to protect the integrity of the vote cast by any citizen." *Id.*

We hold that the district court had jurisdiction to try Cole for voting fraud in violation of § 1973i(c) despite the two federal races being uncontested.[2]

2. *Constitutionality of § 1973i(e)—Void for Vagueness*

■ The court did not commit plain error by applying § 1973i(e), the multiple voter statute, which Cole says is void for vagueness as applied.[3] Cole contends that the statute does not adequately define the phrase "voting more than once" to prohibit his conduct. Where an indictment does not enumerate the necessary elements of the alleged crime clearly and fully, the statute must set forth the elements.[4] *Hamling v. U.S.,* 418 U.S. 87,

---

**2.** Accordingly we also find no merit to Cole's contention that the district court erroneously instructed the jury regarding its jurisdiction.

**3.** Cole did not raise the void for vagueness issue before the district court, so this court "may reverse [the district court] only upon a showing of plain error . . . That is, we may reverse only if,

absent the alleged error, [the defendant] 'probably would have been acquitted.'" *U.S. v. Cherry,* 938 F.2d 748, 753 (7th Cir.1991) (quoting *U.S. v. Hagan,* 913 F.2d 1278, 1282 (7th Cir.1990)) (internal citation and footnote omitted).

**4.** Count 2 of the indictment reads:

117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974). "[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983) (citations omitted). The primary concern of the doctrine is that legislatures establish clear guidelines to govern the discretion of law enforcement officials. *Id.* at 358, 103 S.Ct. at 1858. (citation omitted).

In pertinent part § 1973i(e) states that "[w]hoever votes more than once in an election ... shall be fined not more than $10,000 or imprisoned not more than five years, or both." 42 U.S.C. § 1973i(e)(1). Subsection 3 clarifies slightly the term "votes more than once" by specifying that the term does not include a subsequent vote by a voter whose prior vote was deemed invalid. However, to understand fully the term "vote," one must look to § 1973*l* (c)(1):

> The terms 'vote' or 'voting' shall include all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration, listing pursuant to this subchapter, or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public or party office and propositions for which votes are received in an election.

In common parlance "vote" is defined as "the expression of one's will, preference, or choice," *Black's Law Dictionary* 1576 (6th ed. 1990), or "to express the will or a preference in a matter by ballot, voice, etc.," *Webster's New World Dictionary* 1593 (2d College ed. 1984). Ordinary people can conclude that Cole's behavior is prohibited by

§ 1973i(e). Most of the government witnesses testified that Cole or one of his associates marked their ballots. One witness testified that she thought Cole was registering her to vote; she did not realize that he was voting for her. Ordinary people can conclude that the absentee voters were not expressing their wills or preferences, *i.e.*, that Cole was using the absentee voters' ballots to vote his will and preferences.

In *U.S. v. Salisbury*, 983 F.2d 1369 (6th Cir.1993), the defendants solicited applications for absentee ballots door-to-door. When the ballots were received by the residents, the defendants appeared to "assist" the residents in completing the ballots. Frequently Salisbury would read aloud the numbers of the Republican candidates she supported and the absentee voter would punch the ballot accordingly. Occasionally the defendants would actually punch the absentee ballots themselves, ostensibly on behalf of the absentee voters. Salisbury actively discouraged voters from voting for candidates that she did not support. After punching the ballot, the absentee voter would sign it, and then oftentimes hand it over to Salisbury. The Sixth Circuit determined that neither the indictment nor § 1973i(e) "set forth a clear and unambiguous definition of the term 'vote' or the phrase 'voting more than once.'" *Id.* at 1375. The court then held that the statute did not adequately inform Salisbury of the elements of her alleged crime, thus holding that § 1973i(e) was unconstitutionally vague as applied to Salisbury. *Salisbury* is similar to this case, but we will not follow it. The Sixth Circuit, in looking for a definition of "vote," looked only to § 1973i(e) and the indictment; the court seemingly did not consider the definition laid out at § 1973*l* (c). *Id.* at 1375, 1378–79. Section 1973*l* (c) adequately defines "vote," and that definition is

---

Between on or about January 15, 1990, and March 20, 1990, in the Central District of Illinois, the defendant, DAVIS COLE, a/k/a, COZY COLE, aided and abetted by other persons known and unknown to the grand jury, voted more than once; that is, the absentee ballots of Paul Mercer, Aluella Nutala, Geraldine Phillips, Muriel Rogers, Barbara Thomas and Ruth Thomas, among others, in the March 20, 1990, primary election, which was held in part for the purpose of selecting candidates for the Office of Member of the United States House of Representatives and Member of the United States Senate.

In violation of Title 42, United States Code, Section 1973i(e) and Title 18, United States Code, Section 2.

R. 1.

supported by the common understanding of the word.

### 3. *Trial Proceedings*

Cole was not denied a fair trial because of actions of the prosecutor and failure of the district court to intervene appropriately.

#### a. Leading Questions

We do not need to set out the numerous instances in which Cole says the prosecution used leading questions to establish key elements of its case. Some were not objected to. At other times objections were sustained and the questions rephrased. One of the questions was not leading, but "either/or" in form. In still other instances objections were sustained but counsel did not ask that the answer be stricken. The trial court did not abuse its discretion.

#### b. Questions Concerning Credibility of Witnesses

■ During cross-examination Cole was permitted to testify over objections with respect to the credibility of several prosecution witnesses: whether he knew of any motive of the witness to lie or any interest the witness had in the outcome of the case, or whether the witness was subject to manipulation or was afraid of or hostile towards Cole.

■ Generally the jury determines the credibility of witnesses. At least one court has drawn a fine line between objectionable questions that ask the testifying witness to say whether another witness was lying, and valid questions that ask the testifying witness if he or she knows of biases or motives of another witness. *See U.S. v. Akitoye,* 923 F.2d 221, 224 (1st Cir.1991). In the context of the testimony of Cole on direct examination the prosecutor's questions regarding the potential biases and motives of government witnesses were of the latter, valid type. During direct examination Cole repeatedly had raised questions of the character and credibility of government witnesses. He referred to Renaldo Gayton as "crazy" and

implied that he is an alcoholic. Tr. 416 ("The liquor and other stuff made him crazy."). Cole stated that the parents of government witness Barbara Thomas "drink" and that there was a connection between the families of Barbara and Ruth Thomas, both government witnesses, and Cole's political opponent, Callie Jones, also a government witness. Tr. 419–20, 430. Cole implied that Paul Mercer was biased against him because he (Cole) had refused to co-sign a car loan for Mercer. Tr. 425–26. Cole described Robert Sidener as an illiterate "drunk." Tr. 434. Generally throughout his testimony Cole either implicitly or explicitly stated that the government witnesses lied. *See, e.g.,* Tr. 421, 426, 431.

The prosecutor's cross-examination delved into Cole's knowledge of the biases and motives of the government witnesses which Cole had asserted during his direct examination. In light of Cole's remarks during direct examination the court did not err in permitting the inquiries on cross.[5]

#### c. Closing Arguments

■ Cole questions statements by the prosecutor during closing argument. They were not objected to, so we review for plain error. *U.S. v. Badger,* 983 F.2d 1443, 1455 (7th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 2391, 124 L.Ed.2d 293 (1993). *See also U.S. v. Young,* 470 U.S. 1, 6, 15–16, 105 S.Ct. 1038, 1041, 1046, 84 L.Ed.2d 1 (1985); *U.S. v. Jungles,* 903 F.2d 468, 479 (7th Cir.1990). After considering the prosecutor's statements in light of the entire record, the Court of Appeals should reverse " 'only if a miscarriage of justice would otherwise result.' " *Jungles,* 903 F.2d at 479 (quoting *U.S. v. Hernandez,* 865 F.2d 925, 928 (7th Cir.1989)). *See also U.S. v. Spain,* 536 F.2d 170, 176 (7th Cir.), *cert. denied,* 429 U.S. 833, 97 S.Ct. 96, 50 L.Ed.2d 97 (1976).

■ The prosecutor spoke of the use the jury might make of the indictment:

> You [the jury] can't take the chart to the jury room, but you will have certain docu-

---

**5.** Since we find that the questions during cross-examination were not improper, we will not address Cole's argument that during closing argument the prosecutor engaged in misconduct by commenting about Cole's answers.

ments that can help you. If you come to a point where you are discussing a witness, if you need to do that, and you can't recall what they said, the best thing you can use for that purpose is the indictment.

Now, you are going to get a copy of the indictment. You will get a full and complete copy of the indictment. The indictment serves as a roadmap of much of your evidence.

Obviously, you can't get the kind of detail you heard in trial, but if there is any disputes about who's who and what happened to that particular individual, look to the indictment. Not because the indictment itself is information, but it's going to trigger in your memory what a particular person said.

For example, in the conspiracy count, a number of what we call overt acts are listed, sixteen overt acts. To use an example, the indictment says that on or about February 8, 1990, the Defendant, Davis Cole, also known as Cozy, had Barbara Jean Austin give false information as to her address, to be eligible to vote in Precinct 76.

If you can't recall which of the witnesses were out of the district and gave a false address, one of them was Barbara Jean Austin. And we hope that information on the indictment will trigger in your mind, the collective mind and collective memory, who did what. That's an example. I believe most of the other witnesses, not all of them, and their testimony is pretty much summarized in the indictment.

Closing Arg. 7–8.

Fourteen witnesses had testified to various types of fraud, including false applications for absentee ballots, signing their names to ballots they did not punch, and watching Cole or his associate punch their ballots. Each witness had a similar but slightly different story to tell, and each witness testified for a brief period of time. Considering the prosecutor's comments in the context of his closing argument, he was suggesting to the jury that they could use the indictment to aid in remembering which witness testified regarding each type of crime. Furthermore, the dis-

trict court instructed the jury that the indictment was not evidence.

■■■ Prosecutor's second statement concerned Cole's distinctive handwriting on absentee ballots:

You have seen us handling them [the exhibits], but you never had an opportunity to look at them individually. I am not sure it's necessary. It's pretty much all the same, with the signature down at the bottom. Most of them bear Mr. Cole's fairly distinctive handwriting.

You can see it and determine who made the X or checkmark on the part where they expect to be out of the county. But, of course, you heard them all say, all the witnesses, "It wasn't me, it was Cole."

Closing Arg. 9. The prosecutor was suggesting that the same handwriting appeared on many ballots and that the handwriting was Cole's. Two witnesses testified that Cole filled out sections of their applications, Tr. 153–54, 193, and both applications were admitted into evidence. Cole himself repeatedly testified to completing sections of the absentee voters' applications. There was no dispute at the trial over Cole's handwriting or who had completed those sections of the applications. If improper, the comment was not reversible error.

■■■ The prosecutor made this argument during rebuttal:

Is [defense counsel] speculating that the F.B.I. would take an improper complaint and make it into a criminal charge against him? I think not. I have more belief in the system than that.

Closing Arg. 48. Defense counsel had said this during his closing argument:

How did this all happen, and why did it happen?

You got some hard-ball politics here, folks . . . .

And what better way to remove him [Cole] in the campaign for future elections than to get an investigator and hope something turns up . . . . [T]hey should not be able to do something as unjust as charging a man with these witnesses for voting fraud, because he has not been proven guilty beyond a reasonable doubt.

Closing Arg. 41. The prosecutor's response was an appropriate reply to defense's inference of politically motivated investigation and charges.

None of these jury arguments even approaches plain error.

### 4. *Jury Instructions*

 The final sentence of instructions to the jury regarding § 1973i(e) was:

> If you find beyond a reasonable doubt that the defendant did cast such ballots as the government contends, and if you further find that a federal candidate was on the ballot in this election, then I instruct you that the government has proved that the defendant violated this statute.

R. 19. There was no objection. Cole asserts plain error because the instruction failed to note the essential element of knowledge and willfulness, it did not require proof of the jurisdictional element beyond a reasonable doubt, and it invaded the function of the jury.

The next instruction informed the jury of all of the elements and the fact that the jury needed to find the defendant guilty of each element beyond a reasonable doubt. The jury instructions, as a whole, informed the jury of the required elements and applicable law.

### 5. *Voir Dire*

Cole is an African-American. All jurors were Caucasian. After stressing the importance of selecting an unbiased jury, the court asked all the potential jurors if, "[T]he fact that Mr. Cole is a member of the black race, does this cause any of you any problem at all to sit as a fair-minded juror?" Tr. 35. This essentially paraphrased Cole's only proposed voir dire question on the subject, and defense counsel did not object. Additionally, the court individually addressed a similar question to at least three potential jurors, one of whom was excused for reasons unknown and one of whom was excused presumably because of his professional and personal familiarity with two witnesses. Tr. 58–60, 64–65. The court was not required to further explain and emphasize that racial bias would have no bearing on their consideration of the case.

### 6. *Sentencing Guidelines*

The court's factual determinations regarding the applicability of § 3 of the U.S.S.G. are reviewed under a clearly erroneous standard. *U.S. v. Jackson,* 983 F.2d 757, 762 (7th Cir.1993); *U.S. v. Miller,* 962 F.2d 739, 745 (7th Cir.1992). The court did not err in finding Cole an organizer or leader of a conspiracy involving five or more participants, U.S.S.G. § 3B1.1(a) (1991), and in finding that as registrar of voters he violates a position of public trust, *id.* § 3B1.3 (1991). The court increased two levels for obstruction of justice, *id.* § 3C1.1 (1991). It did not err in considering the affidavit of a government agent filed before a magistrate judge in connection with a motion to revoke Cole's bond for threatening a witness.

### CONCLUSION

The conviction and sentence are AFFIRMED.