*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0240p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

    *v.*

    No. 03-6427

PHILLIP SLONE,

        *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Kentucky at Pikeville.
No. 03-00014—Karen K. Caldwell, District Judge.

Argued: April 21, 2004

Decided and Filed: June 3, 2005

Before: SUHRHEINRICH and GIBBONS, Circuit Judges, LAWSON, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Chad A. Readler, JONES DAY, Columbus, Ohio, for Appellant. Sabrina A. Houlton, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Chad A. Readler, JONES DAY, Columbus, Ohio, for Appellant. Sabrina A. Houlton, Richard C. Pilger, U.S. DEPARTMENT OF JUSTICE, Washington, D.C., Charles P. Wisdom, Jr., ASSISTANT UNITED STATES ATTORNEY, Lexington, Kentucky, for Appellee.

_____

## OPINION

_____

    DAVID M. LAWSON, District Judge. The defendant, Phillip Slone, appeals his guilty-plea-based conviction and sentence for vote buying in a federal election in violation of 42 U.S.C. § 1973i(c) on three grounds. First, he claims that since his conduct related solely to a candidate for a county office, albeit in an election in which federal offices were on the ballot, the facts he admitted at his guilty plea hearing did not constitute a basis to find him guilty of a federal crime. Alternatively, Slone argues that if section 1973i(c) is found to reach the conduct to which he

_____

[*] The Honorable David M. Lawson, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

admitted, the statute is unconstitutional because it exceeds Congress' enumerated powers. Finally, Slone contends that even if his conviction is not vacated, the district court abused its discretion by failing to consider his medical condition as a ground for a downward departure at sentencing. We find no merit in Slone's arguments and therefore affirm his conviction and sentence.

I.

In March 2003, a federal grand jury indicted Phillip Slone on seven counts of vote buying in a federal election in violation of 42 U.S.C. § 1973i(c). Slone, it was charged, offered to pay seven voters fifty dollars each on May 9, 1998 for voting in the primary election to be held on May 26, 1998 in Knott County, Kentucky, "which . . . was held in part for the purpose of selecting and electing a candidate for the office of Member of the United States Senate." The indictment also charged Slone with lying to an FBI agent in violation of 18 U.S.C. § 1001(a)(2) when he said on January 26, 1999 that he had no knowledge of any vote buying.

Slone eventually pleaded guilty on June 4, 2003 to one count of vote buying in exchange for the government's agreement not to pursue additional charges against him. At the guilty plea hearing, Slone admitted that on May 8, 1998, he met Archie DeWayne Tibbs in downtown Hindman, Kentucky, and offered him fifty dollars to vote by absentee ballot in the Democratic primary election for Homer Sawyer, a candidate for the office of Knott County Judge Executive. Slone took Tibbs to the Knott County Courthouse and instructed him to advise the clerk that he intended to be out of Knott County on the day of the primary election and that he wanted to vote by absentee ballot. After voting, Slone asked Tibbs to sign a piece of paper showing that he had voted and then handed him fifty dollars in cash.

Although Homer Sawyer was not a candidate for a federal office, the primary election included a contest for the United States Senate, as was explained during the following exchange at the plea colloquy:

> THE COURT: And now, Mr. Slone, we talked about that in May of 1998, that you were trying to help some candidates for the election that was held in Knott County, Kentucky. Is that correct?
>
> THE DEFENDANT: Yeah.
>
> THE COURT: And which – were you trying to assist somebody who was a candidate for federal office?
>
> THE DEFENDANT: Yeah.
>
> THE COURT: Was that a United States Senate race?
>
> THE DEFENDANT: It was a judge race.
>
> MR. WAGGENER [defense counsel]: Your honor, I believe there's – confused of that matter. It was – he was not trying to assist a federal election. It was a local election held during – I think during the –.
>
> THE COURT: It was a federal election?
>
> MR. WAGGENER: Yes.
>
> THE COURT: There were federal officers on the ballot. Is that correct, Mr. Pilger?

MR. PILGER [AUSA]: Correct, Your Honor. If it will help you out, I can read the facts the United States would prove at trial.

THE COURT: You may do so. And, Mr. Slone, I want you to listen real carefully because I'm going to ask you if Mr. Pilger could prove this if he proceeded to trial.

MR. PILGER: Your Honor, the United States would prove there are federal candidates on the ballot, and there's no need to prove any intent to influence the federal election or to intend to support any particular candidate. If this case proceeded to trial, the United States would prove that on May 26th, 1998, pursuant to the laws of the United States and the Commonwealth of Kentucky, the primary election was held in Knott County, Kentucky, for the purpose of electing, among others, a candidate for the office of Member of the United States Senate.

THE COURT: Is that true, Mr. Slone?

THE DEFENDANT: Yeah. Yeah.

J.A. 61-63.

The district court accepted Slone's guilty plea and held a sentencing hearing on October 15, 2003. During the hearing, Slone's attorney sought a downward departure because of his declining health status. Counsel reiterated the defendant's medical circumstances that were recited in the presentence report, which included a family history of heart disease; two prior heart attacks; open heart surgery; multiple daily medications for his heart disease, back problems, and nervous condition; diabetes requiring daily insulin shots; and deterioration of his eyesight. The district court did not depart downward, but rather sentenced Slone to ten months in custody – the bottom of the Guidelines range – and recommended that he be confined at an institution nearest to his home and family where his physical and medical needs could be addressed.

Slone timely appealed his conviction and sentence.

## II.

Slone's arguments implicate the district court's jurisdiction, since he claims that the statute does not encompass his conduct, or if it does it is unconstitutional. These arguments were not raised in the district court, which ordinarily would preclude review on appeal. *See United States v. Reed*, 141 F.3d 644, 651-52 (6th Cir. 1998). However, when jurisdiction is challenged, and where "[t]he question is simply the proper interpretation and application of the [relevant] statute, requiring no new or amplified factual determination, . . . the fact that the argument was not raised below is immaterial." *United States v. Butler*, 207 F.3d 839, 849 (6th Cir. 2000) (internal quotations and citations omitted). No additional facts need be determined here, and this court reviews the issues of jurisdiction and the constitutionality of a statute *de novo*. *Greater Detroit Res. Recovery Auth. v. EPA*, 916 F.2d 317, 319 (6th Cir. 1990); *Reed*, 141 F.3d at 651.

## A.

The statute under which Slone was charged is 42 U.S.C. § 1973i(c), which states:

Whoever knowingly or willfully gives false information as to his name, address, or period of residence in the voting district for the purpose of establishing his eligibility to register or vote, or conspires with another individual for the purpose of encouraging his false registration to vote or illegal voting, or pays or offers to pay or accepts payment either for registration to vote or for voting shall be fined not more

than $10,000 or imprisoned not more than five years, or both: *Provided, however, That* this provision shall be applicable only to general, special, or primary elections held solely or in part for the purpose of selecting or electing any candidate for the office of President, Vice President, presidential elector, Member of the United States Senate, Member of the United States House of Representatives, Delegate from the District of Columbia, Guam, or the Virgin Islands, or Resident Commissioner of the Commonwealth of Puerto Rico.

Slone insists that this statute cannot be read to extend to conduct that affects candidates for local offices only, and Congress never intended misconduct such as his to be subject to federal prosecution. He reasons that when an elector is paid to vote for a state – but not a federal – candidate on the ballot, there is no vote buying in a "federal election" and thus no violation of § 1973i(c). In support of his argument, Slone cites *Blitz v. United States*, 153 U.S. 308 (1894), in which the Supreme Court interpreted an earlier version of a federal statute regulating election practices and stated: "If, in voting for a state officer at such election, he knowingly personated and voted in the name of another, it was an offense against the state, punishable alone by the state, although the general election at which he voted was one at which a representative in congress was chosen." *Id.* at 313. The statute in that case made "it an offense for any person to knowingly personate and vote, or attempt to vote, in the name of another person, whether living, dead, or fictitious, at an election for representative or delegate in congress." *Id.* at 312. The Court construed the statute narrowly because it found that "[t]he object of section 5511 was to prevent frauds that would affect the vote for representatives in congress, and not to bring elections for state officers under the control of the general government." *Id.* at 313. That legislation was superseded by the Voting Rights Act of 1965, which is the source of the statute under consideration in this case.

To accept Slone's argument, we must read the term "election" in the present statute to mean an individual contest on a ballot. That construction, however, would distort the term, especially when read in context. Elections are events at which multiple office holders and ballot proposals are or may be chosen. Section 1973i(c) refers to "general elections," "special elections," and "primary elections," the purpose of which, "solely or in part," is to select candidates for various federal offices. Construing the word "election" to refer to an individual contest for a single office would render meaningless and unnecessary the modifying phrase "solely or in part," since an "election" for a single office could not have multiple purposes. "Election," therefore, must refer to the casting of a whole ballot on the day fixed for voting (or some earlier appointed time), regardless of how many individual races or proposals are included.

We believe this meaning is clear and unambiguous, as evidenced by the unanimous agreement of every circuit to have considered the question. The statute "uncategorically proscribes payment or offers of payment for voting, whether in a purely federal election or a mixed federal/state election. There is no requirement that the payment or offer of payment be made specifically on behalf of a federal candidate or that a special intent to influence a federal race exist." *United States v. Mason*, 673 F.2d 737, 739 (4th Cir. 1982); *see also United States v. McCranie*, 169 F.3d 723, 726-27 (11th Cir. 1999) (jurisdiction exists in vote buying case involving mixed federal-state election with unopposed federal candidates on the ballot); *United States v. Cole*, 41 F.3d 303, 307 (7th Cir. 1994) (jurisdiction exists in mixed elections); *United States v. Carmichael*, 685 F.2d 903, 908 (4th Cir. 1982) (noting that "it is not necessary for the government to prove that vote-buying activities actually affected a federal contest"); *United States v. Bowman*, 636 F.2d 1003, 1012 (5th Cir. 1981) (same). This circuit's precedent supports this view as well. In *United States v. Salisbury*, 983 F.2d 1369 (6th Cir. 1993), the court considered a related section of the election regulation legislation that prohibited multiple voting. Although the precise question raised here was not specifically addressed in that case, the court noted that "there are at least three elements of the crime deemed to be indispensable: 1) *a candidate for federal office must be on the ballot*; 2) the defendant must vote more than once for *a candidate*; and 3) the defendant must so vote knowingly, willfully and

expressly for the purpose of having her vote count more than once." *Id.* at 1377 (emphasis added) (citing *United States v. Hogue*, 812 F.2d 1568, 1576, 1582 (11th Cir.1987)). There was no requirement that the defendant's misconduct relate specifically to a candidate for federal office.

Although our view that the statute's meaning is clear obviates the need to consider other rules of statutory construction or legislative history, *see United States v. Boucha*, 236 F.3d 768, 774 (6th Cir. 2001) (observing that "[t]he language of the statute is the starting point for interpretation, and it should also be the ending point if the plain meaning of that language is clear"), the congressional record confirms our understanding that section 1973i(c) reaches conduct that affects an election in which a federal office is on the ballot regardless of the defendant's intent to confine his misdeeds to state or local races. The floor debate of April 29, 1965 concerning the amendment that eventually incorporated the proviso into section 1973i(c) is thoroughly summarized in *United States v. Cianciulli*, 482 F. Supp. 585, 613-15 (E.D. Pa. 1979). The court in that case observed that when the original version of the Voting Rights Act of 1965 was introduced in the Senate, there was no proviso that limited the vote-buying provision "to general, special, or primary elections held solely or in part for the purpose of selecting or electing any candidate for the office of President, Vice President, [etc.]" That language was added by Senator Ervin so that section 1973i(c) would not apply to "a *purely* local election, say for mayor, or for representative in a legislature, for sheriff, or for any other local office." *See id.* at 614 (quoting 111 Cong. Rec. 8424 (1965)) (emphasis added). Rather, according to Senator Ervin, the reach of the statute would extend to "elections in which presidential electors and Members of the U.S. Senate and Members of the U.S. House of Representatives are chosen." *Id.* at 615 (quoting 111 Cong. Rec. 8975 (1965)). There is no suggestion, however, that the regulation against vote buying was to apply on a contest-by-contest basis within a single election.

Like our sister circuits, therefore, we hold that 42 U.S.C. § 1973i(c) applies to all elections in which a federal candidate is on the ballot, and the government need not prove that the defendant intended to affect the federal component of the election by his corrupt practices. The facts admitted by Slone at his guilty-plea hearing established all of the essential elements of an offense under this statute, and the district court had jurisdiction to convict and sentence Slone for the violation. *See* 18 U.S.C. § 3231 (providing that "[t]he district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States").

B.

Slone also contends that Congress did not have the authority under the Elections Clause or the Necessary and Proper Clause to regulate conduct that affects only State or local elections, and therefore section 1973i(c) when construed as we read it here is unconstitutional. He relies heavily on *United States v. Lopez*, 514 U.S. 549 (1995), in which the Supreme Court held that the Gun-Free School Zones Act, 18 U.S.C. § 922(q), was an unconstitutional extension of Congress's authority to regulate interstate commerce under Article I, § 8, Cl. 3 because there was no evidence that the intrastate activities the Act purported to regulate had a substantial effect on interstate commerce. In fact, the Court found that the criminal statute in that case had "nothing to do with 'commerce' or any sort of economic enterprise." *Id.* at 561.

Analogies to Commerce Clause jurisprudence, however, are not persuasive when considering Congress' power under the Elections Clause. *See Community Reform Now v. Miller*, 129 F.3d 833, 836 (6th Cir. 1997) (noting that the Elections Clause provides Congress with broader powers than the Commerce Clause). The Elections Clause states: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the places of chusing Senators." Const. Article I, § 4, Cl. 1. Article I, Section 8, Clause 18 of the

Constitution states that Congress has the authority to enact laws that are "necessary and proper for carrying into Execution . . . all other Powers vested by this Constitution in the Government of the United States." Although other circuits have held that the combined effect of these provisions does not permit Congress to regulate "pure" state or local elections, *see Bowman*, 636 F.2d at 1011, elections in which federal and state candidates are on the same ballot are properly subject to federal regulation. *Ibid.* (observing that "Congress may regulate any activity which exposes the federal aspects of the election to the possibility of corruption, whether or not the actual corruption takes place and whether or not the persons participating in such activity had a specific intent to expose the federal election to such corruption or possibility of corruption"); *see also McCranie*, 169 F.3d at 727 (holding that Elections Clause and the Necessary and Proper Clause combine to provide Congress with the power to regulate mixed federal and state elections even when federal candidates are running unopposed).

Under the Elections Clause, Congress is authorized to protect the integrity of federal elections. *See McConnell v. Federal Election Comm'n.*, 540 U.S. 93, 187 (2003) (stating that "Congress has a fully legitimate interest in maintaining the integrity of federal officeholders and preventing corruption of federal electoral processes through the means it has chosen"). Over twelve decades ago, the Supreme Court likened the power to protect the integrity of federal elections to the right to defend the republic itself:

> That a government whose essential character is republican, whose executive head and legislative body are both elective, whose most numerous and powerful branch of the legislature is elected by the people directly, has no power by appropriate laws to secure this election from the influence of violence, of corruption, and of fraud, is a proposition so startling as to arrest attention and demand the gravest consideration . . . . If it has not this power it is left helpless before the two great natural and historical enemies of all republics, open violence and insidious corruption.

*Ex parte Yarbrough*, 110 U.S. 651, 657-58 (1884). It is for Congress to chose the means that "are plainly adapted to that end." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421 (1819).

Slone admitted at his plea hearing that he bought a vote in an election where both federal and local candidates were on the ballot. He says now that his effort to corrupt the election did not have a substantial effect on the federal component because his sole focus was on the candidate for the local office. To say that adulterating part of the election had no effect on the rest, however, is like saying that dumping pollution along the shore has no effect on the folks swimming in the middle of the lake. It is little comfort for them to say that the effluent may not reach into their space. Similarly, an election is a process whose fairness is meant to engender confidence in a democratically selected government. When the purity of the process is compromised in part, the corruption affects the integrity of the whole. *See Bowman*, 636 F.2d at 1012 (stating that "[w]ith federal and state elections held on the same day and with all candidates listed on one ballot, it is impossible to isolate a threat to the integrity of the state electoral process from a threat to the integrity of the federal contest").

We hold that section 1973i(c) falls well within Congress' Article I authority and that it is constitutional as applied to Slone's admitted conduct.

C.

Finally, Slone challenges his sentence on the ground that the district court did not fully recognize its authority to depart from the then-mandatory Sentencing Guidelines on the basis of Slone's medical conditions under U.S.S.G. § 5H1.4. The district court calculated the offense level by starting with a base level of twelve per U.S.S.G. § 2H2.1(a)(2), adding two levels for obstruction

of justice because Slone lied to an FBI agent investigating the vote-buying scheme, *see* U.S.S.G. § 3C1.1, and deducting two levels for acceptance of responsibility under U.S.C.G. § 3E1.1(a). Slone had no prior criminal record and fell in criminal history category I. The combination of a net offense level of twelve and Slone's criminal history category yielded a sentencing range of ten to sixteen months, for which the district court could have imposed a "split" sentence of custody and home confinement. Slone's attorney requested a sentence of "home detention" for the entire term. The district court imposed a sentence of ten months in custody, at the bottom of the Guidelines range, and recommended that the sentence be served at an institution that could accommodate Slone's medical needs. There were no objections to the sentence.

This case was briefed and argued before the Supreme Court decided *United States v. Booker*, 543 U.S. __, 125 S. Ct. 738 (2005), in which the Court determined that it must "excise" 18 U.S.C. § 3553(b)(1) to the extent that the section "require[d] sentencing courts to impose a sentence within the applicable Guidelines range (in the absence of circumstances that justify a departure)." *Id.* at __, 125 S. Ct. at 764. This court has reiterated *Booker*'s pronouncement that sentencing courts must consider the Sentencing Guidelines including "– even though they are no longer bound by – what the guidelines say about departing from the guidelines sentencing range." *United States v. Forrest*, 402 F.3d 678, 689-90 (6th Cir. 2005). We find no error in the district court's disposition of the departure issue. *See United States v. Prince*, 214 F.3d 740, 766 (6th Cir. 2000) (holding that the district court was not required to state affirmatively on the record that it knew it possessed the authority to depart downward).

This court has adopted a flexible approach in allowing defendants to raise issues based on *Booker*, such as filing supplemental briefs and submitting additional authority by letter pursuant to Federal Rule of Appellate Procedure 28(j). *See United States v. McCraven*, 401 F.3d 693 (6th Cir. 2005). The defendant in this case, however, has not asked this court to consider whether his sentence should be vacated and remanded "to accord the district court an opportunity to take another look at the sentence" in light of the now-advisory nature of the Guidelines. *Id.* at 700. We note that service of the defendant's ten-month custody sentence began before this case was argued, and presumably he is now at liberty on supervised release, so perhaps he is content to leave the potential new sentencing issue dormant. We note further that *Booker* was directed mainly to the mandatory application of the Sentencing Guidelines, and the supervised release term in this case was a matter of discretion of the district court. *See* U.S.S.G. § 5.D1.1 (mandating a term of supervised release only "when a sentence of imprisonment of more than one year is imposed, or when required by statute").

Although we are mindful of the concern that "'[w]e [c]ould be usurping the discretionary power granted to the district courts by *Booker* if we were to assume that the district court would have given [the defendant] the same sentence post-*Booker*,'" *United States v. Barnett*, 398 F.3d 516, 530 (6th Cir. 2005) (quoting *United States v. Oliver*, 397 F.3d 369, at 381 n. 3 (6th Cir. 2005)), we likewise believe it imprudent to take such action in the absence of some indication from the defendant that he seeks such relief. Therefore, we will not disturb the district court's pre-*Booker* sentence in this case.

III.

For the reasons stated, we **AFFIRM** the defendant's conviction and sentence.