RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0280p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

No. 13-1072

*v.*

JOHN FRANCIS LECHNER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Michigan at Marquette.
No. 2:11-cr-00049—R. Allan Edgar, District Judge.

Argued: July 29, 2015

Decided and Filed: November 20, 2015

Before: SILER, ROGERS, and STRANCH, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Lauren S. Kuley, SQUIRE PATTON BOGGS (US) LLP, Cincinnati, Ohio, for Appellant. Jennifer L. McManus, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Lauren S. Kuley, Colter L. Paulson, SQUIRE PATTON BOGGS (US) LLP, Cincinnati, Ohio, for Appellant. Jennifer L. McManus, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

_____

## OPINION

_____

SILER, Circuit Judge. A jury convicted John Lechner of two counts each of transporting explosives without a permit and improper storage of explosives, and one count each of possessing explosives while under indictment and making a materially false statement to

government officials. Lechner appeals his convictions. He raises several arguments regarding the constitutionality and proper interpretation of the explosives statutes under which he was convicted and avers that his false statement to government agents was not material. We **AFFIRM**.

## BACKGROUND

In 2002, Congress passed the Safe Explosives Act. Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat 2135 (2002). This law required everyone who possessed, sold, or manufactured explosives to obtain a license or permit through the Federal Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). It also required licensees and permitees to pass a background check and demonstrate to the ATF that their explosives were stored in buildings or containers (known as "magazines") that complied with ATF regulations. *See generally* 18 U.S.C. § 842; 27 C.F.R. §§ 555.1-555.224.

In 2003, Lechner, a Michigan farmer and quarry owner, received a three-year explosives permit even though the ATF had not approved his storage facilities. He then bought two tons of ammonium nitrate/fuel oil ("ANFO"), a highly explosive chemical mixture frequently used for blasting rock quarries.

In 2010, Lechner rented out a house on part of his farm. The renter soon discovered two pallets loaded with 80 bags of ANFO in a nearby barn, and was concerned it was not being stored safely. In November 2010, Lechner moved this ANFO to a detached garage at another residence he owned on Blalock Row. The renter photographed Lechner loading the ANFO onto a truck and reported him to the Michigan State Police.

In an unrelated incident in July 2011, Lechner got into a confrontation with police that stemmed from a property dispute with his former wife. The county prosecutor charged Lechner with three felonies. Lechner attended a preliminary hearing on September 13, 2011, and the charges were bound over for trial.

Meanwhile, on another occasion in September 2011, Lechner appeared in state court concerning a ticket his son had received. An incident in the courtroom led to Lechner's being held in contempt and sentenced to thirty days in jail.

While Lechner was in jail, two ATF agents interviewed him. They asked Lechner about some ANFO they knew he had purchased. He told them he had used it all up. As he later testified, Lechner was trying to prevent the agents from finding and destroying the ANFO because it had cost him a lot of money.

When he got out of jail, Lechner contacted his friend and sometimes-employee, Billy Jo Verette. Lechner asked Verette to help him move the ANFO from the Blalock Row residence to Verette's mother's shed. Verette called the local authorities. They gave Verette a hidden recording device and contacted the ATF. Then, as the recording device ran, Verette helped Lechner move the 80 bags of ANFO.

At one point as they loaded the ANFO onto a horse trailer, Lechner told Verette the ANFO had to be stored "according to federal regulations." Lechner said he didn't "know what the f**k those [regulations] are," but that "just because you don't know, doesn't mean that you don't have to store it that way."

As they unloaded the ANFO, Verette asked Lechner if he had any "big plans for this stuff." Lechner responded, "Yeah . . . When there's a revolution here . . . . When the people decide to take the government back . . . me and you will be . . . mercenaries." Although Lechner later testified that this was a joke, Verette testified that Lechner was not laughing. After Lechner left, agents seized the ANFO. The next day, agents searched the attics of two houses associated with Lechner and found blasting caps in one attic and blasting caps, boosters, and detonating cord in the other.

A federal grand jury indicted Lechner and Kenneth Kassab, Lechner's employee, on nine counts of explosives-related crimes. They were tried in 2012. The jury heard Verette's secret recordings and testimony from several witnesses, including the agents who interviewed Lechner in jail and the agents who searched the attics. The government called two expert witnesses to discuss the requirements for obtaining an explosives permit and the regulations governing the storage and transportation of explosives. The jury found Lechner guilty of six counts and acquitted Kassab.

Lechner moved for a new trial. He asserted he had "newly discovered evidence," by which he meant copies of ATF regulations that were not available to him while he was in jail awaiting trial. But Lechner's counsel told the court he had "thoroughly reviewed all of the significant regulations" and discussed them with Lechner before trial. The district court denied the motion.

## I. ALLEGED CONFLICT BETWEEN 18 U.S.C. § 842(a)(3)(A) and 27 C.F.R. § 555.205(d)

Two of Lechner's convictions were for transporting explosives without a permit in violation of 18 U.S.C. § 842(a)(3)(A). This statute makes it "unlawful for any person . . . other than a licensee or permittee" to knowingly "transport, ship, cause to be transported, or receive any explosive materials." *See also* 27 C.F.R. § 555.26(a). First, Lechner transported his ANFO from his farm to the Blalock Row residence in 2010. Second, in 2011, after ATF agents interviewed him in jail, he moved the explosives from Blalock Row to Verette's shed.

Lechner insists that 27 C.F.R. § 555.205 authorized him to move his ANFO. This regulation, found in the subpart of the Code pertaining to "storage," provides that:

> All explosive materials must be kept in locked magazines meeting the standards in this subpart unless they are:
>
> > (a) In the process of manufacture;
> > (b) Being physically handled in the operating process of a licensee or user;
> > (c) Being used; or
> > (d) Being transported to a place of storage or use by a licensee or permittee or by a person who has lawfully acquired explosive materials under § 555.106.

Lechner claims he is "a person who has lawfully acquired explosive materials under § 555.106." Section 555.106 prohibits licensees and permittees from distributing explosives to anyone who is not a licensee, a user permittee, or "[a] holder of a limited permit who is a resident of the State where distribution is made and in which the premises of the transferor are located." 27 C.F.R. § 555.106(a).

Lechner claims he lawfully acquired his ANFO under a valid permit[1] in 2005. When he later moved the ANFO in 2010 and 2011, he was "a person who [had] lawfully acquired" the explosive materials and was therefore authorized to transport them "to a place of storage" under § 555.205(d). He claims this regulation facially contradicts 18 U.S.C. § 842(a)(3)(A). Accordingly, he proffers three theories based on this alleged contradiction between the statute and the regulation: (1) the regulation renders the statute void for vagueness; (2) the contradiction creates an ambiguity that invokes the rule of lenity; and (3) his reliance on the regulation constituted entrapment by estoppel.

### A. Standards of Review

Lechner did not clearly raise any of these three issues in the district court. The government argues each issue should be reviewed for plain error. *See* Fed. R. Crim. P. 52(b). However, whether review is de novo or plain error, Lechner's arguments under his theories of vagueness, lenity, and entrapment-by-estoppel fail in either event for the reasons below.

### B. Vagueness and Lenity

A criminal statute is void for vagueness when it "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *United States v. Harriss*, 347 U.S. 612, 617 (1954); *see also Johnson v. United States*, 135 S. Ct. 2551, 2556-57 (2015).

The related rule of statutory construction—the rule of lenity—prescribes that "where there is ambiguity in a criminal statute," courts should resolve the ambiguity in favor of the defendant. *United States v. Bass*, 404 U.S. 336, 348 (1971). When we evaluate whether a statute is ambiguous under the rule of lenity, it is not enough for the language to be unclear. We apply the rule "only when the plain language, structure, and legislative history provide no guidance." *United States v. King*, 516 F.3d 425, 432 (6th Cir. 2008) (quoting *United States v. Wagner*, 382 F.3d 598, 610 (6th Cir. 2004)). A statute is not ambiguous merely because it is "*possible* to

---

[1]Even though the ATF witnesses testified that Lechner's permit was never officially approved, Lechner did possess two physical permits. We assume without deciding that Lechner's facially valid permits enabled him to lawfully acquire explosives from 2003 to 2006. The government does not concede this point.

articulate a construction more narrow than that urged by the Government." *Moskal v. United States*, 498 U.S. 103, 108 (1990).

Even assuming that a *regulation* can trigger the rule of lenity or the void-for-vagueness doctrine, Lechner can find no solace in § 555.205. First, this regulation inhabits the subpart pertaining to storage (Subpart K). Another regulation, found in Subpart C (which contains "Administrative and Miscellaneous Provisions"), tracks the language of the statute. This regulation specifically addresses "[p]rohibited . . . transportation . . . of explosive materials." It states that "[n]o person, other than a licensee or permittee knowingly may transport, ship, cause to be transported, or receive any explosive materials . . . ." 27 C.F.R. § 555.26. When read in context, the storage regulation upon which Lechner relies does not abrogate the statute and regulation that explicitly prohibit non-licensees like Lechner from transporting explosives.

Second, Lechner cannot rely on § 555.205 when he was in clear violation of its main directive. The regulation commands that "[a]ll explosive materials must be kept in locked magazines meeting the standards in [Subpart K] unless they are . . . [b]eing transported to a place of storage or use by [an approved person]." 27 C.F.R. § 555.205(d). And "a place of storage" must itself be a regulation-compliant locked magazine. *See generally* 27 C.F.R. §§ 555.201-220. Section 555.205 cannot condone Lechner's transportation of ANFO because neither of the buildings where he stored the ANFO met ATF standards. Regardless of whether he was a person who "lawfully acquired" the explosives, at no time in 2010 or 2011 was Lechner in compliance with the regulation he cites.

Third, the evidence establishes that Lechner was subjectively not relying on § 555.205 when he moved his ANFO in 2011. First, he told Verette in the recorded conversation that, although ANFO was strictly regulated, he didn't "know what the f**k those [regulations] are." Second, the fact that Lechner lied to the agents that the ANFO was "used up" and then surreptitiously moved the ANFO to someone else's property shows that he knew his possession and storage of ANFO were illegal. As we explained in *United States v. Kernell*, 667 F.3d 746, 750 (6th Cir. 2012), a void-for-vagueness challenge requires the defendant to prove the statute

was misleading "as applied to his particular case." The fact that Lechner lied to federal agents about his ANFO and then tried to hide it shows he had fair notice he was violating the law.

For each of these reasons, Lechner has not shown that the statute was vague or that this court should invoke the rule of lenity. Section 842(a)(3)(A) of the criminal code is perfectly clear. A person without a license or permit is forbidden from transporting explosives. A storage regulation that creates a common-sense exception to the rule that explosives must be kept in locked, regulation-compliant magazines does not render the statute so vague as to not give fair notice. And, because the statute is clear, there is no reason to invoke the rule of lenity.

### C. Entrapment by Estoppel

The entrapment-by-estoppel defense is available when (1) the government announces that the charged criminal act was legal; (2) the defendant relies on the announcement; (3) the reliance is reasonable; and, (4) "given the defendant's reliance, the prosecution would be unfair." *United States v. Levin*, 973 F.2d 463, 468 (6th Cir. 1992). The governmental announcement upon which Lechner says he relied is the ATF regulation, 27 C.F.R. § 555.205(d), discussed above.

Lechner cannot establish any error. First, as we just explained, a proper reading of the regulations does not amount to an announcement that Lechner's transportations of ANFO were legal. Second, the evidence does not suggest Lechner relied on the alleged announcement (the regulation) because the way he stored his explosives was already in violation of the regulations. Lechner told Verette he did not even know what the regulations were. Third, Lechner's alleged reliance would not have been reasonable because he knew before he moved the ANFO in 2011 that the ATF was interested in the ANFO and suspected the agents planned to seize and destroy it. Fourth, under these circumstances, prosecuting Lechner for deliberately attempting to hide large quantities of high explosives from the ATF would not be unfair. In sum, under any standard of review, Lechner fails to meet the elements of entrapment by estoppel.

### II. COMMERCE CLAUSE

Under the principles of American constitutional federalism, Congress possesses only the powers that are "delegated" to it by the text of the Constitution. *See* U.S. Const. amend. X. Congressional authority for the regulation of explosives derives from the Commerce Clause.

U.S. Const. art. I, § 8, cl. 3 ("Congress shall have the power . . . to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."). The power to regulate commerce among the states extends to three spheres: the channels of interstate commerce; the instrumentalities of interstate commerce and persons or things traveling in interstate commerce; and activities that have a substantial effect on interstate commerce. *Gonzales v. Raich*, 545 U.S. 1, 16-17 (2005).

Lechner argues that because his possession, storage, and transportation of explosives happened wholly within the state of Michigan, his crimes lack a nexus to interstate commerce. He does not contest the jury's finding that his explosives were manufactured outside Michigan.

Lechner's Commerce Clause challenge is a constitutional attack that implicates the court's jurisdiction to apply the statute. *See Slone*, 411 F.3d at 646. Even though Lechner failed to raise the argument in the district court, we review it de novo.

Courts have consistently held that Congress may regulate the sale, storage, transportation, and possession of explosives—just as Congress heavily regulates drugs and firearms. In *Barrett v. United States*, 423 U.S. 212, 225 (1976), the Supreme Court held that the federal Gun Control Act covers the intrastate receipt of "a firearm that previously had moved in interstate commerce." This was so because the "very structure" of the Act "demonstrates that Congress did not intend merely to restrict interstate sales but sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous." *Id*. at 218. The same rationale applies to the federal regulation of explosives. *See United States v. Holloway*, 744 F.2d 527, 529-30 (6th Cir. 1984) (citing *United States v. Freed*, 401 U.S. 601, 609 (1971)); *United States v. Dawson*, 467 F.2d 668, 673 (8th Cir. 1972) ("There being a rational basis upon which Congress properly could have determined that the misuse of explosive materials is one activity which, as a class, affects commerce, the Government need not specifically allege and prove a connection between interstate commerce and the conduct made criminal by § 842(h)."). Congress's comprehensive regulation of explosives—like its regulation of firearms and drugs— is permissible because the misuse of such material, especially when transported on highways, has a substantial effect on interstate commerce.

### III. POSSESSING EXPLOSIVES WHILE UNDER INDICTMENT

Under 18 U.S.C. § 842(i), it is unlawful for any person "who is under indictment for, or who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to ship or transport any explosive in or affecting interstate or foreign commerce or to receive or possess any explosive which has been shipped or transported in or affecting interstate or foreign commerce." For purposes of this statute, a charge by information is equivalent to a charge by indictment. *See* 27 C.F.R. § 555.142(e).

Lechner argues that the court plainly erred when it failed to instruct the jurors that they had to find that Lechner *knew* he was indicted. He also protests that the law is unconstitutional because it is impossible for a lawful possessor of explosives to comply: when an authority issues an indictment, this automatically causes the owner of explosives to violate the statute.

### A. Standard of Review

Lechner's argument that the court was required to supply an additional mental-state element is not a jurisdictional issue. The remedy would be to read a mental state into the statute, not to hold the statute unconstitutional. *See Staples v. United States*, 511 U.S. 600, 604-07 (1994). Similarly, Lechner's "impossible compliance" issue could be avoided by reading a *mens rea* into the statute or by applying the rule of lenity. Because we could remedy each of these alleged defects by applying canons of statutory construction, they are not jurisdictional. Because Lechner failed to present these theories to the district court, we review for plain error.

### B. Background

In July 2011, a county prosecutor charged Lechner by information with three state felonies. This prosecutor testified at Lechner's trial. He described the charges, stated that they were still pending, and explained that Lechner attended the preliminary hearing on those charges in August 2011 and was bound over for trial. During his testimony, Lechner also recalled attending the preliminary hearing. The following exchange occurred:

Q You went to a preliminary examination, correct?
A Yes.
Q You were bound over?

A I really disagree that I was bound over, but I—but I guess I was.
Q You understand that somebody that's under indictment can't have explosives?
A Well, I know that there is a law that says [so.] This is the funny situation. Because the second that you get bound over, that means you gotta go to prison for ten years because you have got explosives. Well, that's not what they meant by that law. And even in the law it says you have got 30 days to dispose of it . . . . Say I have got 150 ton of explosives, and then . . . as soon as you do get [indicted or convicted], then automatically you go to prison for ten years because you got explosives. The law wants you to be able to get rid of it. There is a compliance law or . . . something in there that says you have got 30 days to dispose of the explosives before you have to go to prison for ten years.
Q These are within the regulations—
A Well, it is a law. It is ATF rules and laws, regulations and laws.

In closing, Lechner's counsel stated that although Lechner had charges "filed against him" after he had "issues with the police," Lechner "didn't believe that he was under indictment." Lechner's counsel told the jury it was his understanding that Lechner "also believed that, according to the regulations, that whoever was in charge of the ANFO had a period of time, if you were under indictment, to get rid of those items."

The district court instructed the jury that it had to find five elements beyond a reasonable doubt: (1) that Lechner possessed ANFO, blasting caps, detonators, or detonation cord; (2) that Lechner possessed the materials knowingly; (3) that at least one of the listed items was an explosive; (4) "that at the time that the defendant possessed the explosive . . . [he was] under indictment for a crime punishable by imprisonment for a term exceeding one year"; and (5) "that the explosive had been shipped or transported in interstate commerce prior to the defendant's possession of it." The court specified that the government "need not prove the defendant knew that he was prohibited from possessing explosives."

## C. Actual Knowledge of Indictment

The traditional rule of substantive criminal law is that every crime must contain an element of "scienter," a level of mental culpability. *Staples*, 511 U.S. at 605 (citing *United States v. Balint*, 258 U.S. 250, 251 (1922)). But "public welfare" or "regulatory" offenses sometimes present an exception to this background principle. *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 71 (1994); *Freed*, 401 U.S. at 609.

Lechner's argument that the government must prove actual knowledge of the indictment under § 842(i)(1) fails under plain error review. First, Lechner cannot demonstrate that the alleged error seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *See Henderson v. United States*, 133 S. Ct. 1121, 1126-27 (2013) (reciting the elements of a plain error claim). Any error would be harmless because there was uncontroverted proof Lechner knew he was under indictment. The state charges were filed against Lechner months before he was interviewed by ATF agents. Lechner admitted he attended the hearing on these charges and he "guess[ed]" he had been "bound over."

Second, any error would not be "plain" because we have held that—when it comes to a "while under indictment" regulatory crime—proving knowledge of the indictment is necessary in only one limited circumstance. The Kentucky defendant in *United States v. Renner*, 496 F.2d 922 (6th Cir. 1974), illegally bought a gun while he was under indictment. But at the time he literally did not know he was under indictment. Renner had previously been indicted for armed assault with intent to rob, was arrested, and then appeared in state court. Renner testified at his federal trial that the prosecuting witness in the state case told him "he was going to drop the charges," and that Renner thought the case was "thrown out of court" at that point. *Id.* at 923. The state court did not tell him to appear again, so Renner thought the indictment "had been dismissed." *Id.* What actually happened was that the court had "filed away" the indictment "with leave to reinstate" on the recommendation of the prosecuting witness. *Id.* The indictment was not formally dismissed for over three years. *Id.* We reversed his convictions for knowingly possessing firearms while under indictment. *Id.* at 926-27.

Subsequent cases have limited *Renner* to its facts. *See Stanley v. Turner*, 6 F.3d 399, 405 (6th Cir. 1993) (highlighting *Renner*'s "unusual facts," i.e., that the defendant "was possibly misled by the apparent dismissal of an indictment against him"); *United States v. Minnick*, 949 F.2d 8, 10 n.1 (1st Cir. 1991) (observing that *Renner* is the only federal case to have imposed a scienter requirement on a gun-control law); *Holloway*, 744 F.2d at 530 & n.4 (explaining that *Renner*'s "narrow holding . . . should be limited to its facts"); *United States v. Williams*, 588 F.2d 92, 93 (4th Cir. 1978) (per curiam) (explaining that *Renner* confronted "the manifest unfairness of convicting a defendant when the indictment may be unserved or when,

under the practice in some states, it may have been dismissed, but with leave to reinstate it"); *United States v. Barrett*, 504 F.2d 629, 634 (6th Cir. 1974) ("The rule of [*Renner*] should be confined to the facts of that case."), *aff'd*, 423 U.S. 212 (1976); *United States v. Cowper*, 503 F.2d 130, 132 (6th Cir. 1974) ("*Renner* applied specifically only to the requirement of knowledge applicable to 18 U.S.C. § 922(h)(1)."). Because *Renner* is an outlier that is distinguishable from this case, the law was not plain that Lechner had to know he was indicted.

To the extent that Lechner's *mens rea* argument attacks the jury instructions, any error would be "invited error" because the instruction at issue was jointly submitted by Lechner and the government. *In re Bavelis*, 773 F.3d 148, 157 (6th Cir. 2014) (defining the invited-error rule as the principle that a party may not complain on appeal of errors that he himself invited or provoked the court to commit).

### D. Impossible Compliance

Lechner's other theory regarding his possession-while-under-indictment conviction is that the law is facially unconstitutional under the Due Process Clause. Section 842(i) "renders compliance impossible," he argues, when people who lawfully possess explosives "are then indicted for a crime."

Lechner has produced no case law suggesting that 18 U.S.C. § 842(i) is unconstitutional, which means the error cannot be plain. *See Jackson*, 549 F.3d at 977. Nor would any error on this issue have seriously affected the fairness, integrity, or public reputation of judicial proceedings. *See Henderson*, 133 S. Ct. at 1127. Lechner's impossible compliance argument is conceptually similar to his scienter argument and fails for similar reasons. Like drug possession and firearm possession, this is a regulatory crime involving materials that threaten public safety. The congressional intent is to keep explosives out of the hands of dangerous people. Ample evidence at Lechner's trial demonstrated his insouciance toward the handling of explosions and his recalcitrance toward the regulations. Even though a well-meaning person could conceivably violate the law, such is not the case before us.

Lechner points out that the ATF "has attempted to moderate the harsh consequences of the statute through a grace period for licensees." Indeed, 27 C.F.R. § 555.142(e)(1) provides a

permittee or licensee with a thirty-day grace period following the date of indictment or information. Even so, this regulation would not apply to Lechner because he had no valid permit or license when he came under indictment. Furthermore, Lechner made no attempt to capitalize on this grace period. He was charged by information in July 2011, but still possessed the ANFO in September. Instead of cooperating with ATF when they approached him, he tried to squirrel away his ANFO on someone else's property.

## IV. JURY INSTRUCTIONS ON ATF REGULATIONS

Under 18 U.S.C. § 842(j), it is unlawful "for any person to store any explosive material in a manner not in conformity with regulations promulgated by the Attorney General." The jury convicted Lechner of improperly storing his explosive materials—which included ANFO, blasting caps, detonating cord, and detonators—"during November 2010" and "on or about September 20th, 2011."

The district court instructed the jury that to find Lechner guilty on these counts, the government had to prove that: (1) Lechner stored the explosives; (2) Lechner did so knowingly; (3) the explosives "were stored in a manner not in conformity with regulations promulgated by the Attorney General"; and (4) at least one of the items at issue was an "explosive material." The court specified that the government "need not prove the defendant knew how the explosive materials were supposed to be stored." In addition, the government did not have to prove that Lechner "knew that he was storing explosive materials in a manner not in conformity with regulations promulgated by the Attorney General." The jury instructions did not elaborate on the ATF regulations' requirements.

Lechner argues on appeal that, because the regulations themselves are embedded within the third element of the crime, the court should have instructed the jury on the content of the regulations. The jury instructions on § 842(j) were jointly submitted by Lechner and the government. The argument is therefore waived under the invited error rule, *In re Bavelis*, 773 F.3d at 157, unless the interests of justice demand otherwise, *United States v. Savoires*, 430 F.3d 376, 381 (6th Cir. 2005). Even if the interests of justice demanded that we consider this invited error, it would fail under plain error review.

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). However, even when a court erroneously omits an element of the crime, when the omitted element "is supported by uncontroverted evidence," the error may be harmless. *Neder v. United States*, 527 U.S. 1, 18 (1999).

Lechner argues that "[i]t cannot be discerned from the trial record precisely which of the regulations Mr. Lechner was alleged to have violated, much less which of the regulations the jury found he was guilty of violating beyond a reasonable doubt." The record belies this assertion. The jury was informed about the regulations. But the information came from an expert witness rather than from the court.

> In its opening statement, the government explained the "improper storage" charges:

> There [are] only two counts but there is a number of different locations where the stuff is stored. None of these locations are adequate. Some of these things are in houses. Some of them are adjacent to houses. None of those storage locations are adequate, acceptable, and so that's going to be the basis for the conviction on improper storage.

To prove these counts, the government called ATF "senior industry operations investigator" Margaret Carvill as an expert witness. Carvill explained that she "enforce[s] the federal rules and regulations dealing with firearms and explosive industry members," which includes conducting "application inspections" for entities seeking a license and "compliance inspections" of licensees. Carvill said she "brought a copy" of the regulations to the witness stand, and told the jury anyone could read the regulations on the ATF's website.

During her direct examination, the government showed Carvill pictures of Lechner's "magazines" and asked her "whether they meet the storage requirements." In response, Carvill testified that the regulations contain a chart that establishes how far a magazine must be from an inhabited building. She said Lechner's storage buildings failed to comply. For example, one of the storage buildings was only 150 feet from a house when the regulations required a distance of 1,370 feet. Carvill testified that the storage shed at the Blalock Row residence was also "completely unlawful" because it had the wrong kind of door, lacked an adequate lock, and

contained "rubbish." Her assessment of Verette's shed was similar: "We would never approve that."

Regarding the blasting caps found in the attic of a house, Carvill explained that "[e]xplosive material is never allowed to be stored in a residence." Concerning the house that contained blasting caps, boosters, and detonating cord in the attic, Carvill said the storage was also unlawful because blasting caps and boosters "cannot be stored together."

The government read to Carvill from Lechner's permit application:

Section 842(i) 18 USC provides, quote, "It shall be unlawful for any person to store any explosive material in a manner not in conformity with regulations promulgated by the secretary," end quote. ["]Before applying for a license or permit, the applicant must read and be familiar with the requirements as set forth in 27 CFR, part 55, subpart K, storage.["]

Carvill agreed that this language on the application would "put the applicant on notice that they have to have a proper storage facility." During cross-examination, Lechner's counsel asked Carvill whether "[t]he storage regulations are found at CFR 555.201," and she agreed. At the end of cross-examination, Lechner's attorney also asked:

Q And there are rules also related to removing explosives from the magazines, in order to clean the magazines?
A That's correct.
Q They can be moved temporarily to other locations away from the magazine?
A Yes.
Q And once there, you get the opportunity to clean the magazine and then presumably everything gets put back?
A Yes.

Lechner did not object to Carvill's testimony. And Lechner later admitted in his own testimony that the lock was missing from the shed at the Blalock residence.

Accordingly, the jury heard evidence that Lechner's storage of explosive materials was noncompliant with ATF regulations in a number of ways:

- The ANFO sheds lacked locks.
- The ANFO sheds had the wrong kinds of doors.
- The ANFO sheds contained other materials that were not permitted.
- The ANFO sheds were too close to inhabited buildings.

- The blasting caps, boosters, and detonator cord were unlawfully stored in a residence.
- The blasting caps and boosters in one attic were unlawfully stored together.

Additionally, the jury heard that the source of these regulations was "27 CFR, part 55, subpart K," and "CFR 555.201." The only remaining question, then, is whether plain error occurred because the court itself did not identify or discuss the content of the regulations—even though Lechner never asked the court to do this.

There was no "plain error" in these instructions because, as the government points out, "Lechner cites no case requiring jury instructions to set out the text of regulatory requirements that are otherwise established in the record before the jury." *See Jackson*, 549 F.3d at 977. Also, when the jury has been told by an expert witness—without objection—the precise ways in which Lechner's storage of explosives violated the regulations, the alleged error would not seriously affect the fairness, integrity, or public reputation of judicial proceedings. *See Henderson*, 133 S. Ct. at 1127. Even if it was error for the court to omit the content of the regulations from the jury instructions, Lechner's failure to comply with the regulations was "supported by uncontroverted evidence." So any error would have been harmless. *Neder*, 527 U.S. at 18.

Lechner argues that Carvill "never established what the regulations actually say," but instead foisted her own "thoroughly biased . . . midrash on the regulations." But, if Carvill's testimony was inaccurate, Lechner's counsel could have cross-examined her regarding her biases and asked her to read and interpret the regulations more thoroughly. *See United States v. Gold*, 743 F.2d 800, 820 (11th Cir. 1984). Lechner's counsel may have been reticent to do so because drawing the jury's attention to the text of the regulations would not have worked in Lechner's favor.

In this case, (1) Lechner had the opportunity to cross-examine the regulations expert; (2) Lechner commented on the regulations in his own testimony; and (3) Lechner's attorney recounted Lechner's interpretation of the regulations during closing arguments. The expert identified six ways Lechner violated the regulations, and Lechner presented no evidence or argument that he was in compliance. He was therefore not prejudiced by the jury instructions, and there was no plain error.

## V.  MATERIALITY OF FALSE STATEMENT

Under 18 U.S.C. § 1001(a)(2), it is a crime when anyone, "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully . . . makes any materially false, fictitious, or fraudulent statement or representation."  At Lechner's trial, agents testified that when they visited him in jail and asked him what he had done with his ANFO, he said he "used it all up."

When Lechner testified, he said the agents had "tricked" him into saying the ANFO was used up.  Lechner claimed what he actually meant was that he had sold his company to his son, so the ANFO no longer belonged to him.  On cross-examination, the prosecutor asked Lechner, "you lied to [the ATF agents], didn't you?"  Lechner responded that he told "a white lie."  Later, the prosecutor asked Lechner "how many white lies" he had told in court.  "One," Lechner responded, "and it wasn't a lie."  "I just didn't want that stuff destroyed," he said.  "[A]nd I told them that I used it because, in my mind, I used what was mine and everything else was sold to [my son].  So if that was a white lie, and I told you, it was whatever, a white lie."

In closing arguments, the government explained that to be found guilty, Lechner's statement "has to be material, and of course, it would appear to be the case.  They are investigating an explosives case and their main suspect is saying, no, I don't have any.  That's a material statement."  Lechner's counsel argued, "I don't know . . . if a white lie is considered a false statement under the law or not.  That's for you to decide."  The district court then instructed the jury that "[a] material statement or representation is one that has a natural tendency to influence or is capable of influencing a decision or function of, in this case, the Bureau of Alcohol, Tobacco, Firearms, and Explosives."  *See United States v. Gaudin*, 515 U.S. 506, 509 (1995) (reciting this materiality standard).

Lechner now challenges only the sufficiency of the evidence.  Although this entails a form of *de novo* review, the defendant bears a heavy burden.  *United States v. Napier*, 787 F.3d 333, 345 (6th Cir. 2015).  The challenge fails if, "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id*. (quoting *Jackson v. Virginia,* 443 U.S. 307, 319 (1979)).  We may not independently weigh the evidence or make our own judgments about the

credibility of the witnesses. *Id*. We must draw every reasonable inference from the evidence in the government's favor. *United States v. Cecil*, 615 F.3d 678, 691 (6th Cir. 2010).

Lechner cannot surmount this standard. If the agents had believed Lechner's assertion that the ANFO had been "used up," this lie would have been capable of influencing the investigation. Lechner even admitted that he lied to the agents to prevent the ANFO from being destroyed. Lechner's lie, no matter its color, was calculated to influence the investigation, and was "capable" of doing so. *Gaudin*, 515 U.S. at 509. The evidence was sufficient to convict.

Lechner points to one of the district court's statements at sentencing. In considering whether to apply a sentencing enhancement for obstruction under USSG § 3C1.1, the court stated: "Of course whatever he told the agent didn't impede the investigation, because obviously they proceeded right ahead and found the storage barn." But this discussion of whether Lechner deserved a sentencing enhancement for "significantly obstruct[ing] or imped[ing]" the investigation or prosecution, USSG § 3C1.1, cmt. 4 (G), has no bearing on the jury's previous finding that Lechner's false statement was material.

**AFFIRMED.**